TEXAS STATE BOARD OF EXAMINERS
IN OPTOMETRY et al., Petitioners,

v.

Ellis CARP et al., Respondents.

No. A–11478.

Supreme Court of Texas.

Feb. 8, 1967.

**308**

Crawford C. Martin, Atty. Gen., Hawthorne Phillips and John Reeves, Asst. Attys. Gen., Will Garwood and Tom Gee, Sp. Asst. Attys. Gen., Niemann & Babb, Charles N. Babb, Austin, Strasburger, Price, Kelton, Miller & Martin, Mark Martin, Dallas, for petitioners.

Price Daniel, Austin, Douglas E. Bergman, Dallas, Keith, Mehaffy & Weber, Quentin Keith, Beaumont, for respondents.

POPE, Justice.

Doctors Ellis Carp, S. J. Rogers, and N. Jay Rogers sued The Texas State Board of Examiners in Optometry and sought a declaratory judgment that the Professional Responsibility Rule adopted on December 21, 1959 by the Board was void. They also asked for a permanent injunction against the Board's enforcement of the rule. The trial court denied the relief prayed for and sustained the validity of the rule. The court of civil appeals held that although there was substantial evidence which supported the rule, the Board exceeded its delegated powers in promulgating it and therefore, the rule was invalid. 401 S.W. 2d 639. In our opinion the Board did not exceed its statutory powers in promulgating the rule. We reverse the judgment of the intermediate court and affirm that of the trial court.

The court of civil appeals held that the rule was not arbitrary or capricious and that there was substantial evidence of the relationship between the rule and the general welfare of the citizens of Texas. We too find that the rule is grounded upon substantial evidence. The necessity for such a rule was demonstrated by the general support it received from the members of the optometry profession and professional so-

cieties and the record which abounds with evidence of the specific evils the rule was designed to correct. Some portions of the record will be mentioned and commented on in our analysis of the specific provisions of the rule.

■ The central question presented by the points before us is whether the Board exceeded its delegated powers in promulgating the Professional Responsibility Rule. In determining this issue, we must examine the general purposes of the Optometry Act as well as certain specific provisions of the act. The Legislature's primary purpose in passing the act was to assure and protect the personal and professional relationship between an optometrist and his patient. To make certain that this purpose was carried out, the act requires an optometrist to be licensed before he may practice within the state. The optometrist must evidence his identity and professional qualifications by registering and recording his license in any county in which he practices. Articles 4561–4562 [1]; article 735 Vernon's Ann. Penal Code. He must also display his license in his office, and when he practices away from his office, he must identify himself by affixing to each bill for glasses his signature, address and the number of his license. Article 736, Vernon's Penal Code. Personal identification by those practicing any of the healing arts is of such significance that the Legislature requires a licensee to identify the particular system which his license permits him to practice. Article 4556. It is in this statutory context of fixing professional identification and personal responsibility that we now examine the powers delegated to the State Board of Examiners in Optometry and the provisions of the particular statutes and the rule which the Board promulgated. Article 4556 is the source of the Board's rule-making authority. It provides:

" * * * The Board shall have the power to make such rules and regulations not inconsistent with this law as may be necessary for the performance of its duties, the regulation of the practice of optometry and the enforcement of this Act. * * *"

Article 4563 provides that the Board of Examiners may refuse to issue a license to an applicant and may cancel, revoke or suspend any license it has granted for any of the following reasons:

"(a) That said applicant or licensee is guilty of gross immorality;

"(b) That said applicant or licensee is guilty of any fraud, deceit or misrepresentation in the practice of optometry or in his seeking admission to such practice;

"(c) That said applicant or licensee is unfit or incompetent by reason of negligence;

"(d) That said applicant or licensee has been convicted of a felony or a misdemeanor which involves moral turpitude;

"(e) That said applicant or licensee is an habitual drunkard or is addicted to the use of morphine, cocaine or other drugs having similar effect or has become insane or has been adjudged by a court of competent jurisdiction to be of unsound mind;

"(f) That said licensee has directly or indirectly employed, hired, procured, or induced a person, not licensed to practice optometry in this State, to so practice;

"(g) That said licensee directly or indirectly aids or abets in the practice of optometry any person not duly licensed to practice under this Act;

"(h) That said licensee directly or indirectly employs solicitors, canvassers or agents for the purpose of obtaining patronage;

"(i) That said licensee lends, leases, rents or in any other manner places his

---

I. Unless indicated otherwise, all articles cited in this opinion are contained in Vernon's Civil Statutes.

license at the disposal or in the service of any person not licensed to practice optometry in this State;

"(j) That said applicant or licensee has wilfully or repeatedly violated any of the provisions of this Act."

The questioned Professional Responsibility Rule, except for its severability clause, is copied in the footnote to Texas State Board of Examiners in Optometry v. Carp, 388 S.W.2d 409, 411–412 (Tex. 1965). The footnote to the opinion of the court of civil appeals, 401 S.W.2d 639, 640–641, is a good summary of section 1 of the rule, which we adopt. Section 1 provides that no optometrist shall:

"(a) Divide, share or split fees with any lay person, firm or corporation. However, it shall not be construed a violation of the Rule if an optometrist (1) pays an employee in the regular course of employment, or (2) leases space on a percentage or gross receipts basis; and (3) he may sell or assign accounts receivable.

"(b) Divide, share or split fees with another optometrist or physician except (1) on a division of services and (2) then only with the knowledge of the patient, but (3) the Rule will not be interpreted to prevent partnerships.

"(c) Practice under or use an assumed name in connection with his practice. However (1) partners may practice under their full or last names, and (2) optometrists employed by other optometrists may practice under their own names in an office listed in the names of their employers.

"(d) Use or allow his name or professional identity to be used on the door, window, wall or sign of any office or location where optometry is practiced unless said optometrist is actually present and practicing therein during office hours.

"(e) Practice in any office or location where any name or professional identification on any sign shall indicate that such office or location is owned, operated or supervised by any person not actually present and practicing therein during office hours.

"(f) Requirements (d) and (e) above shall be deemed satisfied if the optometrist is (1) physically present more than half the total hours the office is open for at least nine months of the year; or (2) physically present in such office at least one-half the time such person conducts, directs or supervises any practice of optometry; or (3) regularly makes personal examinations of eyes at such location or regularly directs or supervises such examinations."

Section 2 of the rule provides that the wilful or repeated failure of an optometrist to comply with any provision of section 1 shall be considered prima facie evidence that such optometrist is guilty of a violation of law, and shall be grounds for filing charges to cancel, revoke, or suspend his license or to enjoin him from continuing such violation. Section 3 of the rule provides that if any part of the rule be held invalid, the intent of the Board was to promulgate the remainder of the rule.

The court of civil appeals in striking down the rule in its entirety, held that article 4563 and other statutes stated specific grounds for refusing or cancelling a license, that the statement of specific grounds was an exclusion of all others, and that the Legislature intended that the Board should not add new or inconsistent grounds. The authorities in support of the legal principles applied by the court of civil appeals are listed in the court's opinion. Our opinion is, however, that each provision of the rule must be separately examined to determine whether it is related to and consistent with the grounds for cancellation or refusal that the Legislature listed. In other words, the real question presented is whether the rule states new or inconsistent grounds as held by the intermediate court.

In Kee v. Baber, 157 Tex. 387, 303 S.W. 2d 376 (1957), this court sustained the validity of three rules that the Board of Optometry promulgated. These rules regulated "bait" advertising, basic competence, and corporate practice of optometry. The court held that article 4556 was a broad delegation of regulatory powers to the Board since it authorized the Board to adopt such rules as are necessary for "the regulation of the practice of optometry." The court also held that each of the rules was consistent with, related to, and an implementation of one or more of the prohibited categories set out in article 4563. The Professional Responsibility Rule which is under attack prohibits five forms of practice by those licensed as optometrists, and as in Kee v. Baber, we shall examine each of the prohibited practices with reference to article 4563 and other optometry regulations.

■ Section 1(a) of the rule prohibits fee-splitting by a licensed optometrist with an unlicensed person. Since the Optometry Act forbids an unlicensed person to directly charge fees for optometric services, such a person cannot undermine the act by indirectly charging and collecting fees through the device of fee-splitting. The prohibition of fee-splitting with laymen is generally related to the personal and professional relationship between optometrist and patient which is requisite to the practice of optometry and is specifically related to article 4563(b) which prohibits a "deceit or misrepresentation in the practice of optometry * * *." It is related to article 4563(h) which authorizes revocation of a license when the "licensee directly or indirectly employs solicitors, canvassers, or agents for the purpose of obtaining patronage," and article 773, Vernon's Penal Code, which provides that no optometrist may "employ or agree to employ, pay or promise to pay, or reward or promise to reward any person, firm, * * * for securing, soliciting or drumming patients or patronage." It is related also to article 4563(i) since a licensee who shares his professional fees with an unlicensed person "places his license at the disposal or in the service of a[ny] person not licensed to practice optometry in this State."

■ Section 1(b) of the rule prohibits a division of fees by a treating optometrist with another optometrist. This section is subject to some exceptions but even then the fee-splitting is permissible only with the knowledge of the patient. This section is relevant to the same provisions of the Optometry Act as section 1(a). Section 1(b) protects the same personal and professional relationship between the optometrist and his patient and that purpose runs through the whole act. The section is relevant to article 4563(b) because the treating optometrist holds himself out to his patient as the one who is performing the services and is to be paid upon the basis of those services. A patient who ignorantly pays optometric fees based upon elements other than service alone and which fees are paid to absentee optometrists is misled.

■ Section 1(c) of the rule prohibits the practice of optometry under assumed or trade names. The reason for this section is that the trade or assumed name practice, like fee-splitting, disrupts the optometrist-patient relationship by concealing the identity and burying the responsibility of the licensed optometrist. The need for section 1(c) is clearly supported by substantial evidence some of which we shall now summarize since it demonstrates the relevance of this section to the provisions of article 4563. Dr. Carp operates seventy-one offices in Texas. He advertises them under the following trade names: Luck Optical, Luck One Price Optical, Mast Optical, Mesa Optical, Mack Optical, Plains Optical, Amarillo Optical, Lubbock Optical, Panhandle Optical, and Mission Optical. From time to time he adds, drops, or changes the trade name at a particular office although the licensed optometrists employed in that office remain the same. He has purchased the practices of licensed optometrists and practices under their name

although they are no longer associated with the respective offices in any manner. Illustrative of Dr. Carp's trade or assumed name practice is the situation that exists in Wichita Falls. Within a two-block area in that city, Dr. Carp maintains offices operated under the names of Mast Optical, Luck Optical, and Lee Optical. The same supervisor oversees these three offices. Each office dispenses the same optical goods and services and uses the same kind of equipment. Optometrists are shifted from one location to the other. Dr. Carp's advertising represents to the public that these three offices are in competition with each other thereby creating the false impression that they are each independently owned and operated. Similar situations exist in Dallas and El Paso. On the other hand, Texas State Optical, owned by the Doctors Rogers, operates eighty-two offices in Texas and advertises only under the one trade name. Although no trade name can be licensed to practice optometry, Texas State Optical advertises by the use of such statements as "a scientific TSO eye examination."

The practice of optometry under a trade name is a holding out to the public that the trade name is licensed. The result is that the identity of the licensed practicing optometrists is hidden behind the unlicensed trade name. Prescriptions belong to those operating the trade name business rather than the prescribing optometrist. The practice is confusing and misleading to the public. In Kee v. Baber, supra, this court upheld a Board rule which required an optometrist to separate his practice from the business operations of mercantile establishments, and did so on the grounds that it was a safeguard for the optometrist-patient relationship and would avoid confusion on the part of the public. The court there held that the rule which prohibited corporate practice of optometry was reasonably referable to article 4563(i), which prohibits placing an optometrist's license "in the service or at the disposal of unlicensed

persons." Practice under a trade name is similar to practice under a corporate name which was denounced in *Kee*. Section 1(c) is also reasonably referable to article 4563 (b) which prohibits "deceit or misrepresentation in the practice of optometry." See also article 738a, Vernon's Penal Code.

The practice of a profession under a trade name has often been regulated and prohibited by rules. Fisher v. Schumacher, 72 So.2d 804 (Fla.1954); Pearle Optical of Monroeville Inc. v. Georgia State Board of Examiners in Optometry, 219 Ga. 364, 133 So.2d 374 (1963); State Board of Dental Examiners v. Bohl, 162 Kan. 156, 174 P.2d 998 (1946); Silverman v. Board of Registration in Optometry, 344 Mass. 129, 181 N.E.2d 540 (1962); Toole v. Michigan State Board of Dentistry, 306 Mich. 527, 11 N.W.2d 229 (1943); State Board of Optometry v. Orkin, 249 Miss. 430, 162 So.2d 883 (1964); Strauss v. Univ. of New York, 2 N.Y.2d 464, 161 N.Y.S.2d 97, 141 N.E.2d 595 (1957); Strauss v. Univ. of New York, 282 App.Div. 593, 125 N.Y.S.2d 821 (1953); Straus Inc. v. Univ. of State of New York, 186 Misc. 242, 59 N.Y.S.2d 429 (Sup.Ct. 1945); 41 Am.Jur. Physicians and Surgeons § 52 (1942); 70 C.J.S. Physicians and Surgeons §§ 31, 33 (1951).

Sections 1(d), 1(e), and 1(f) of the rule require and assure the presence of an optometrist at the offices with which his name is identified and at which he holds himself out as a practitioner. Substantial evidence was presented to prove that such rules were needed to correct the evil of misleading representations to the public. Named optometrists have been identified with scores of widely separated offices in Texas, notwithstanding the fact that they have neither practiced at nor been inside many of the places with which their names are associated. Dr. Carp has advertised and practiced under the names of Douglas Optical, Shannon Optical, Pearl Optical, Lee Optical, Lee Optical Company and Dr. L. H. Luck. Those are the names of licensed optometrists who sold Dr. Carp their locations

and the use of their names but continued their practice independently of Dr. Carp.

Texas State Optical's advertising leaves the impression that one of the Doctors Rogers is present at a particular office. Actually they have neither been inside nor seen some of their eighty-two offices distributed generally over Texas. They list their names in phone books in cities where they do not purport to practice optometry and on plaques showing the names of the optometrists who serve particular offices though they do not in fact practice at such offices. Since such practices are deceptive and misleading, sections 1(d), 1(e), and 1(f) are relevant to article 4563(b). Toole v. Michigan State Board of Dentistry, supra, and Campbell v. State, 12 Wash.2d 459, 122 P.2d 458 (Wash. 1942).

■ We conclude that the court of civil appeals erred in its holding that the Professional Responsibility Rule added new and inconsistent provisions to the Optometry Act. To the contrary, our opinion is that the rule's provisions are in harmony with the general objectives of the act and referable to and consistent with one or more of its specific proscriptions. We believe that the Legislature, by investing the Board with broad rule-making powers "[for] the enforcement of this Act" and "[for] the regulation of the practice of optometry," contemplated that the Board would use these powers to correct the evils, generally classified in article 4563, or some other provision of the Optometry Act. If these rule-making powers did not authorize the Board to regulate evils not encompassed in the specific wording of the act, they would be nothing more than meaningless excess.

■ Respondents urge two additional reasons in support of the judgment of the court of civil appeals—the case of Southwestern Bell Tel. Co. v. Texas State Optical, 253 S.W.2d 877, (Tex.Civ.App. 1952, no writ) and the legislative history of the Optometry Act. In the *Southwestern Bell*

*Tel. Co.* case the Doctors Rogers brought an injunction suit and compelled the telephone company to list Texas State Optical, the trade name, in the yellow pages of the Port Arthur telephone directory. At that time the Board had not yet undertaken to implement the act. The case did not come to this court, and the opinion contains a number of holdings that are inconsistent with our views expressed above. The court held that "[t]he fact that no license to practice optometry has been issued to 'Texas State Optical' is not material." The decision reflects an absence of factual background about the evils of the trade name practice of optometry as evidenced by its holding that such practice is not against the public interest so long as the public by making a search can discover the persons using the name. We disapprove these holdings. Whether the telephone company should list an optometrist's trade name is not the same issue as that of the Board's power to make rules prohibiting practice under a trade name.

Respondents urge that the Legislature did not enact proposed legislation which would have prohibited trade name practice of optometry and fee-splitting. The argument is that the original Optometry Act, as introduced, had a provision which prohibited the practice of optometry under any name other than a licensee's own proper name and also had a provision which would have made it a penal offense to falsely impersonate any person licensed as an optometrist. Acts 46th Leg.R.S.1939, ch. 4, pp. 360–368. Before passing the bill, the Legislature deleted the sections which prohibited trade name practice, Vol. II House Journal, 46th Leg.1939, pp. 2529–2534, and fee-splitting, Senate Journal, 46th Leg.1939, pp. 1958–1968. Respondents urge that the Legislature by deleting the prohibitions against the practices from the bill, implied an intent that such practices should be permitted. Respondents' reasoning is that "[n]o court should read into a statute by implication that which both Houses of the Legislature have expressly rejected

\* \* \*." Grasso v. Cannon Ball Motor Freight Lines, 125 Tex. 154, 81 S.W.2d 482 (1935).

■ The Legislature did not adopt specific prohibitions of trade name practice and fee-splitting; however, any implications which might be derived from that action are overcome by the Legislature's express grant of broad rule-making powers to the Board. Kee v. Baber, supra. The Legislature expressly empowered the Board to make rules to regulate the practice of optometry and enforce the act. Rather than an implied limitation of Board powers, the act extended the powers of the Board. Instead of an implied grant of permission to practice under a trade name, the act's rule-making provision empowered the Board to make appropriate rules grounded upon substantial evidence of the evils against which the public should be protected. Gibbs v. United States Guarantee Co., 218 S.W.2d 522 (Tex.Civ.App.1949, writ ref.). In Kee v. Baber, supra, this court so treated the grant of rule-making powers and we sustained the rule which prohibited corporate practice of optometry on the reasoning that it implemented the Legislature's prohibition against placing an optometrist's license "in the service or at the disposal of unlicensed persons." On similar reasoning, the Board had the power to prohibit the same result under a different scheme. The trade name entity is no more a licensee than a corporate entity. The Board passed its rule after substantial evidence showed that a widespread practice existed in Texas which undermined sections (b), (h), and (i) of article 4563 and the general purpose of the act to identify and establish personal responsibility of the licensee. It is our opinion that the Legislature in failing to enact the specific provisions, intended instead to provide a better method for the Board to regulate the profession, and that it did this by an express authorization for the Board to tailor and make its rules for the particular needs of the profession and the public so long as they are relevant to the statutory proscriptions.

We reverse the judgment of the court of civil appeals and affirm the judgment of the trial court.

SMITH, J., dissenting.

### DISSENTING OPINION

SMITH, Justice.

I respectfully dissent. The Legislature provided in Article 4563 ten grounds for refusing or canceling the license of an optometrist. The rule now under attack was adopted by the Texas State Board of Examiners in Optometry. In my opinion, each of the rules' outright proscriptions has been added as a new ground to those enumerated by the Legislature for the revocation of licenses. Since the Legislature through the enactment of Article 4563 has definitely listed the reasons authorizing the Board, in its discretion, to refuse to issue a license to any applicant in the first place, and to cancel, revoke or suspend the operation of any license by it granted, any rule adopted by the Board must by its own terms be referable to or related to a specific provision of Article 4563. An examination of the specific provisions of Article 4563 and the provisions of the rules under attack leads me to conclude that each provision is an outright and independent proscription. The forbidden acts as stated in Section 1 of the rule are not by their own terms referable to or related to any specific provisions of Article 4563. On this point I can add very little to the holding of the Court of Civil Appeals, 401 S.W.2d 639. However, I do wish to emphasize that when the Legislature said to the Board that it may cancel, revoke or suspend a license for ten specific reasons, it negatived any other grounds that might have been permitted under general rule-making powers. See State v. Mauritz-Wills Co., 141 Tex. 634, 175 S.W.2d 238, 241 (1943); 41 Am.Juris. 172, Physicians & Surgeons, 44; Graeb v. State Board of Medical Examiners, 55 Colo. 523, 139 P. 1099, 1101, 47 L.R.A.,N.S., 1063 (Sup.Ct.Colo.1913). This latter case in-

volved a Colorado statute which assigned nine specific "acts and conduct as may justify the revocation of a license". The Court held: "[q]uite clearly the causes designated in the statute are exclusive, and the maxim, 'expressio unius est exclusio alterius,' applies. * * * "

The Board contends and this Court seems to approve the contention that the rule under attack does not add new offenses to those listed in Article 4563. Both the Board and the Court rely heavily upon our holding in Kee v. Baber, 157 Tex. 387, 303 S.W.2d 376 (Sup.Ct.1957). In considering and approving the *Kee* case, I was of the opinion and still maintain that the rules considered in *Kee* were specifically tied to and closely related to specific sections of Article 4563. The rules there involved were designed to implement rather than to add a new and independent rule. Our decision in *Kee* stressed the idea and, in fact, the Court found that the board rule-making powers (emphasized by the Court in the present case) were intended "to vest the Optometry Board with authority to *fill in the details relating to the proscribed actions.*" [emphasis added]. My analysis of *Kee* leads to the conclusion that this Court was not holding in *Kee* that the Board could do the proscribing itself. In our case, the Board makes no contention that the rule under attack in any manner is enacted to fill in the details or in implementation of a prospective enactment. The Board is seeking, at the hands of this Court, power to make the proscriptions in the first instance and for such rules to have the force of law just as though the Legislature had included them in the statute. I respectfully maintain that an administrative agency may not enlarge the causes for which a license may be revoked or suspended. See Cherry v. Board of Regents of the University of State of New York, 289 N.Y. 148, 44 N.E. 2d 405 (1942). In *Cherry,* the Court held that since the New York Legislature has enumerated the reasons for suspension or revocation of licenses, the Board cannot, by adoption of rules, add to the statutorily

enumerated grounds. The Court said in *Cherry*:

"[W]e have said that the Board of Regents' 'specific supervisory powers over the practice of dentistry * * * enable it, within reasonable limits, to prescribe canons by which conduct deemed by it, in the exercise of fair judgment, to be unprofessional and objectionable may, in the interest of rescuing that profession from vulgar commercialism, be banned.' Matter of Dr. Bloom Dentist, Inc., v. Cruise, 259 N.Y. 358, 363, 182 N.E. 16, 17. The field in which that power may be exercised is nonetheless subject to restriction by the Legislature, and even within the field in which the Legislature has delegated to the Board of Regents power to prescribe canons banning conduct which it deems unprofessional and objectionable, the Board of Regents cannot by the exercise of that power enlarge the causes for which the license of a dentist may be revoked or suspended, as defined in subdivision 2 of section 1311.

" * * *

"[T]he bill which had been introduced in the Legislature defining the grounds for the revocation of a dentist's license included as an additional ground 'that the dentist has violated the rules of the regents governing advertising or any other rules.' That ground was stricken out before the bill was passed.

" * * *

"[T]he Legislature has, itself, specified the grounds upon which a license to practice dentistry may be suspended or revoked. The Legislature has not delegated to the Board of Regents power to create offenses which shall furnish additional grounds."

Here again, I wish to emphasize that the Court in the present case has misconstrued its holding in Kee v. Baber, supra. We simply held in that case that the Board may enact such rules and regulations as would be consistent with the power given it under the provisions of Article 4556.

It is my position that the broad regulatory powers given to the Board in Article 4556 were to be exercised by the Board in a manner consistent with Article 4563. The Legislature has not only enumerated specific grounds for license revocations, it has also set forth detailed and specific offenses which would constitute violations of the Act. The Legislature has pre-empted the field of punishable offenses as well as grounds for license revocation. This action prevails over its general grant of power to the Board "to make such rules and regulations not inconsistent with this law as may be necessary for * * * the regulation of the practice of optometry and the enforcement of this Act."

To further demonstrate that the Board is seeking rule-making power in the field of license revocation regardless of statutory limitations, I take up its argument that the Board has the same license revocation powers as those given to the Supreme Court and the State Bar. In advancing this argument, the Board fails to distinguish between the fact that the Optometry Act enumerates the reasons for revocation of licenses, whereas the State Bar Act does not do so. Article 320a–1, Sec. 4, subdivision (a) provides:

"From time to time as to the Court may seem proper, the Supreme Court of Texas shall prepare and propose rules and regulations for disciplining, suspending, and disbarring attorneys at law; for the operation, maintenance and conduct of the State Bar and prescribing a code of ethics governing the professional conduct of attorneys at law. * * * "

The 46th Legislature enacted both the State Bar Act and the Optometry Act. The State Bar Act authorizes the Supreme Court to enumerate the grounds and procedures for suspension or cancellation of licenses and the means of enforcement. This is not true with the Optometry Act. Whatever its reasons for making this distinction might have been is beside the point; the fact remains that the Legislature in adopting the Optometry Act deliberately enumerated the .grounds for cancellation and revocation and set up by penal statute the means of enforcement. Therefore, the Board has no authority to add new grounds and new procedures for license revocations under the general powers set out in Article 4556. See Kentucky State Board of Dental Examiners v. Crowell, 220 Ky. 1, 294 S.W. 818, 819 (Ct. of App.Ky.1927); 2 Am.Jur. 2d 130, Administrative Law § 301; Cherry v. Board of Regents of the University of the State of New York, supra.

Respondents in their conditional application for writ of error and in a supplemental brief filed herein present additional points [1] for declaring the rule under attack invalid. I think these points merit consideration. In my opinion the rule is arbitrary and capricious and bears no relationship to the health and well being of the citizens of Texas. The rule is invalid because there was no substantial evidence to support a finding

1. "STATEMENT OF RESPONDENTS' CROSS-POINTS
"FIRST CROSS-POINT
"The rule is arbitrary and capricious and bears no reasonable relationship to the health and wellbeing of the citizens of Texas, and the Trial Court and the Court of Civil Appeals erred in not so holding.
"SECOND CROSS-POINT
"The rule is invalid because there was no substantial evidence to support a finding that the rule bears any reasonable relationship to the public health and welfare, and the Trial Court and Court of Civil Appeals erred in not so holding.

"THIRD CROSS-POINT
"The rule is invalid because the same would impair the obligation of contracts in violation of both the state and federal constitutions and would take Respondents' property without due process of law, and the Trial Court and the Court of Civil Appeals erred in not so holding.
"FOURTH CROSS-POINT
"The rule is invalid because its arbitrary and capricious nature would take Respondents' property without due process of law, and the Trial Court and the Court of Civil Appeals erred in not so holding."

that the rule bears any reasonable relationship to the public health and welfare. Respondents pleaded in the trial court that the "rule is arbitrary and capricious in that it does not have or bear any substantial relationship to the protection of the public in its dealings with persons licensed to practice optometry under the laws of the State of Texas." The Court of Civil Appeals quotes some of the evidence on this question. The record contains evidence concerning the care exercised in the selection of employee-optometrists by one of the Respondents' organizations. This evidence relates to the educational background of the optometrists selected, the fact that they were licensed by the Board and their practical experience, etc. With reference to the "Professional Responsibility" phase of the rule under attack, one of the Respondents, who is also a member of the Board, testified:

"Q. Now, Dr. Rogers, when a man is employed, an optometrist in your organization, do you have any standing instructions as to how he shall conduct the practice and to whom his first and primary allegiance and responsibility is?

"A. Yes, we do.

"Q. And what is that?

"A. Well, number one, the man, as I mentioned is solely responsible for his action with that patient, for his—whatever he does or doesn't do with regard to the patient and his sole allegiance, his sole responsibility, is to do what in his opinion is necessary or best or in the best interest of that patient or that patient's visual care. This is the basis upon which all of our offices operate and this is the way a man conducts himself, just as though he were in his own office."

The Board wholly failed to establish its contention that a person employed by another optometrist in a trade-name organization lacks professional responsibility to this patient. In fact this contention was refuted by the following testimony:

"Q. Now in all of your experience, Dr. Rogers, as an optometrist, and as a Board member, now something in excess of six years, I will ask you the point blank question, are optometrists practicing on a salary, or a compensatory basis, on a solely employed basis, and in a trade name organization such as yours, are they just as competent, just as sincere, just as diligent as those who practice solely or individually?

"A. Yes, I think so, I sincerely do."

The Respondent, Dr. Carp, also testified:

"Q. Doctor, let me ask you this question: As an optometrist, who is the primary responsibility of an individual doctor associated with you in one of your offices where is his primary responsibility, to you or to the patient whose eyes he examines?

"A. By all means to the patient."

There is a complete absence of testimony given by patients or others which even remotely suggested that the care given to patients in Respondents' establishments located throughout the State was any less satisfactory to the patient, than the care given in the offices of individual practitioners. There is no evidence that the practice of optometry under trade or assumed names in multiple offices injuriously affects the public health.

It is argued that other jurisdictions have adopted rules similar to the one under consideration. Grant this is true, still the Board has made no showing that conditions were the same in each instance. There is no showing that the Legislatures in the other jurisdictions have refused to adopt the essential proscriptions contained in the rule under attack. On the other hand, it is clear that the Texas Legislature has consistently declined to include in its enactments the unconstitutional proscriptions

contained in the Board rule now before us. A court cannot substitute its judgment for that of the legislative branch of the government. There is no provision of the Board's rule here involved that bears any reasonable relationship to the public welfare. It is clear that the rule is advanced for the economic protection of a particular class rather than for the protection of the public generally. There is no evidence of any *need* for the regulation insofar as the public is concerned. Simply stated, the Board has failed to discharge its burden that there was substantial evidence in existence at the time of the adoption of the rule to justify its adoption. See Kost v. Texas Real Estate Commission, 359 S.W.2d 306, (Tex.Civ.App.1962, writ ref'd). Not only has the Board failed in this regard, but more important, it has, in adopting this rule, exceeded the authority conferred upon it by law. In striking down a regulation promulgated by a Board, this Court in Teachers Retirement System of Texas v. Duckworth, 153 Tex. 141, 264 S.W.2d 98 (1954) adopted the opinion of the Court of Civil Appeals, Tex.Civ.App., 260 S.W.2d 632. The adopted language which is applicable here reads:

"Even if it can be said that the regulation adopted by the Board making the last payment due on the last day of the month next preceding the month in which the beneficiary dies has the effect of canceling the exceptions to the common-law rule against apportionment which would otherwise be applicable to this case, we are inclined to agree with appellee that the judgment must still be sustained because, as contended by her, the Board was without power to adopt and enforce the regulation. It has been held in this State that the Board of Insurance Commissioners can exercise only the authority conferred upon it by law '* * * "in clear and unmistakable terms, and will not be deemed to be given by implication, nor can it be extended by inference, but must be strictly construed."

* * *' Commercial Standard Ins. Co. v. Board of Insurance Com'rs of Texas, Tex.Civ.App., 34 S.W.2d 343, 345, writ refused. And in like manner has the power of the Railroad Commission of Texas been construed."

There is another reason which is perhaps greater than any reason thus far advanced to support the argument that the rule should be stricken down by the courts. The rule strikes at the fundamental right of an optometrist to lawfully engage in his profession. I agree with the Respondents that the rule impairs the obligation of contracts. Not only that, it is arbitrary and capricious in nature and has been adopted without regard to the law as enacted by the Legislature and in violation of both the state and federal constitutions. The rule amounts to a taking of Respondents' property without due process of law. The rule has not been enacted for the benefit of the public, but to the contrary there is every indication that the rule has been adopted to protect the economic welfare of a few optometrists, despite the fact that the rule will place in jeopardy property rights which the Legislature has thus far chosen to safeguard. Some of the consequences of this unwarranted rule will be to prohibit the use of an assumed name in the practice of optometry and to impose strict limitations on the operation of multiple offices and the splitting of fees with employee-optometrists. The maintenance of 82 offices at many locations in Texas, at a cost of between $10,000.00 and $12,000.00 per office and at a cost of more than $1,000,000.00 in publicizing the assumed name "Texas State Optical", so far as the record shows, means nothing to the relators, but it should have some significance to this Court in deciding the question of the validity of the rule. In this connection, I repeat that there is no evidence in the record which would tend to show any public need or necessity for the rule. To the contrary, the rule arbitrarily interferes with private business in that it imposes unnecessary restrictions upon the

lawful occupation of the respondents, Lawton v. Steele, 152 U.S. 133, 14 S.Ct. 499, 38 L.Ed. 385 (1894).

The Courts should not hesitate to intervene to protect the property rights of a citizen when it is discovered from a record such as we have here that a Board has exceeded its powers under the guise of the exercise of the police power of the State. This Court in the case of Houston & T. C. R. Co. v. Dallas, 98 Tex. 396, 84 S.W. 648, 70 L.R.A. 850 (1905), in considering the exercise of the police power, has this to say:

"The power is not an arbitrary one, but has its limitations. It is commensurate with, but does not exceed, the duty to provide for the real needs of the people in their health, safety, comfort, and convenience as consistently as may be with private property rights. As those needs are extensive, various, and indefinite, the power to deal with them is likewise broad, indefinite, and impracticable of precise definition or limitation. But as the citizen cannot be deprived of his property without due process of law, and as a privation by force of the police power fulfills this requirement only when the power is exercised for the purpose of accomplishing, and in a manner appropriate to the accomplishment of, the purposes for which it exists, it may often become necessary for courts, having proper regard to the constitutional safeguard referred to in favor of the citizen, to inquire as to the existence of the facts upon which a given exercise of the power rests, and into the manner of its exercise, and if there has been an invasion of property rights under the guise of this power, without justifying occasion, or in an unreasonable, arbitrary, and oppressive way, to give to the injured party that protection which the Constitution secures."

This Court supported its position with a quotation from Lawton v. Steele, 152 U.S. 133, 14 S.Ct. 499 (1894) which reads:

" * * * [t]o justify the state in thus interposing its authority in behalf of the public, it must appear—First, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals. The legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations."

In the case of Smith v. Decker, 158 Tex. 416, 312 S.W.2d 632 (1958), this Court held unconstitutional a statute which deprived citizens of the right to earn a living, a property right. In holding void the act there involved, we said:

"Appellants having a vested property right in making a living, subject only to valid and subsisting regulatory statutes, and being prevented from performing their business otherwise lawful but for the statute in question, we believe that we are permitted under the rule announced in Kemp Hotel Operating Co. v. City of Wichita Falls, [141 Tex. 90, 170 S.W.2d 217], supra, to order the issuance of the injunction. There it was stated that courts of equity may be resorted to for the purpose of enjoining the enforcement of a criminal statute or ordinance when same is void and when its enforcement invades a vested property right of the complainant."

The judgment of the Court of Civil Appeals should not only be affirmed, but this Court should go further and declare the rule unconstitutional.