FRIEDMAN ET AL. *v.* ROGERS ET AL.

No. 77–1163. Argued November 8, 1978—Decided February 21, 1979*

*Together with No. 77–1164, *Rogers et al.* v. *Friedman et al.;* and No. 77–1186, *Texas Optometric Assn., Inc.* v. *Rogers et al.*, also on appeal from the same court.

1

2

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, WHITE, REHNQUIST, and STEVENS, JJ., joined, and in Part III of which MARSHALL and BLACKMUN, JJ., joined. BLACK-MUN, J., filed an opinion concurring in part and dissenting in part, in which MARSHALL, J., joined, *post*, p. 19.

*Larry Niemann* argued the cause and filed briefs for appellant in No. 77–1186.

*Dorothy Prengler,* Assistant Attorney General of Texas, argued the cause for appellants in No. 77–1163 and appellees in No. 77–1164. With her on the briefs were *John L. Hill,* Attorney General, *David Kendall,* First Assistant, and *Steve Bickerstaff* and *Richard Arnett,* Assistant Attorneys General.

*Robert Q. Keith* argued the cause and filed briefs for appel-

lants in No. 77–1164 and appellees in Nos. 77–1163 and 77–1186.†

MR. JUSTICE POWELL delivered the opinion of the Court.

Texas law prohibits the practice of optometry under a trade name. It also requires that four of the six members of the State's regulatory board, the Texas Optometry Board, be members of the Texas Optometric Association, a professional organization of optometrists. A three-judge District Court sustained the constitutionality of the statute governing the composition of the Texas Optometry Board against a challenge based on the First and Fourteenth Amendments. But it held that the prohibition of the practice of optometry under a trade name ran afoul of First Amendment protection of commercial speech. 438 F. Supp. 428 (ED Tex. 1977). These appeals and the cross-appeal bring both of the District Court's holdings before the Court.[1]

## I

The Texas Legislature approved the Texas Optometry Act (Act) in 1969, repealing an earlier law governing the practice of optometry in the State. Section 2.01 of the Act establishes the Texas Optometry Board (Board) and § 2.02 prescribes the qualifications for Board members.[2] The Board

---

†*Ellis Lyons, Bennett Boskey, Edward A. Groobert,* and *Edwin E. Huddleson III* filed a brief for the American Optometric Assn. as *amicus curiae* urging reversal in Nos. 77–1163 and 77–1186 and affirmance in No. 77–1164.

[1] The District Court also sustained a constitutional challenge to the statute prohibiting price advertising by optometrists, but upheld the statute regulating the referral of patients by optometrists to opticians. Neither of these holdings has been appealed to this Court.

[2] Section 2.02 provides:

"To be qualified for appointment as a member of the board, a person must be a licensed optometrist who has been a resident of this state actually engaged in the practice of optometry in this state for the period of five years immediately preceding his appointment. A person is disqualified

is responsible for the administration of the Act, and has the authority to grant, renew, suspend, and revoke licenses to practice optometry in the State.[3] The Act imposes numerous regulations on the practice of optometry,[4] and on several aspects of the business of optometry.[5] Many of the Act's business regulations are contained in § 5.13, which restricts fee splitting by optometrists and forbids an optometrist to allow his name to be associated with any optometrical office

from appointment to the board if he is a member of the faculty of any college of optometry, if he is an agent of any wholesale optical company, or if he has a financial interest in any such college or company. At all times there shall be a minimum of two-thirds of the board who are members of a state optometric association which is recognized by and affiliated with the American Optometric Association."

The Act is codified as Art. 4552 of the Texas Revised Civil Statutes Annotated (Vernon 1976). The section numbers of the Act and those within Art. 4552 are the same, and we will refer only to the Act.

[3] Act § 4.04.

[4] It is unlawful to practice optometry without a license. § 5.04. An applicant for a license to practice optometry must meet certain educational standards, § 3.02, and must pass an examination covering subjects specified in the Act. §§ 3.01, 3.05. Once licensed, an optometrist must meet an annual continuing education requirement to be eligible for renewal of his license. § 4.01B. Optometrists are forbidden to treat diseases of the eye, and to prescribe ophthalmic lenses without a personal examination of the patient. §§ 5.05, 5.07. In a section entitled "Basic competence," the Act specifies the elements of the examination that an optometrist must conduct before he prescribes for a patient. § 5.12.

[5] An optometrist must display his license in his office; when practicing away from his office, he must include his name and license number on a receipt given to each patient. § 5.01. Fraudulent, deceitful, and misleading advertising is proscribed by § 5.09, though the ban placed by that section on truthful price advertising has been nullified by the decision of the District Court in this case. See n. 1, *supra*. An optometrist is forbidden to advertise in his office windows or reception rooms, and to use certain types of signs to advertise his practice. § 5.11. The practice of optometry on the premises of mercantile establishments is regulated, § 5.14, and relationships between optometrists and opticians are restricted. § 5.15.

unless he is present and practicing there at least half of the hours that the office is open or half of the hours that he practices, whichever is less. Section 5.13 (d), at issue here, prohibits the practice of optometry under an assumed name, trade name, or corporate name.[6]

The dispute in this case grows out of the schism between "professional" and "commercial" optometrists in Texas. Although all optometrists in the State must meet the same licensing requirements and are subject to the same laws regulating their practices, they have divided themselves informally into two groups according to their divergent approaches to the practice of optometry.[7] Rogers, an advocate of the com-

---

[6] Section 5.13 (d) provides in part:

"No optometrist shall practice or continue to practice optometry under, or use in connection with his practice of optometry, any assumed name, corporate name, trade name, or any name other than the name under which he is licensed to practice optometry in Texas . . . ."

The scope of the prohibition in § 5.13 (d) is limited by various provisions in § 5.13 that make it clear that the Act does not proscribe partnerships for the practice of optometry, or the employment of optometrists by other optometrists. Regarding partnerships, counsel for the defendant Board members indicated at oral argument that § 5.13 (d) does not require that the names of all partners be included in the name used to identify the office of an optometrical partnership. Tr. of Oral Arg. 28. With respect to employees, § 5.13 (d) provides that "[o]ptometrists who are employed by other optometrists shall practice in their own names, but may practice in an office listed under the name of the individual optometrist or partnership of optometrists by whom they are employed."

[7] No matter which of these business methods an optometrist adopts, the standards for licensing are uniformly high. An optometrist, to qualify for a license, must be a graduate of a university or college of optometry, and must pass an examination in "practical, theoretical, and physiological optics, in theoretical and practical optometry, and in the anatomy, physiology and pathology of the eye as applied to optometry." Act §§ 3.02, 3.05. The dissenting opinion minimizes the professional character of an optometrist's services, stating that his duties are "confined . . . to measuring the powers of vision of the eye and fitting corrective lenses." Post, at 27. But it is clear from the requirements for licensing imposed

mercial practice of optometry and a member of the Board, commenced this action by filing a suit against the other five members of the Board. He sought declaratory and injunctive relief from the enforcement of § 2.02 of the Act, prescribing the composition of the Board, and § 5.13 (d) of the Act, prohibiting the practice of optometry under a trade name.

Section 2.02 of the Act requires that four of the six members of the Board must be members of a state organization affiliated with the American Optometric Association (AOA). The only such organization is the Texas Optometric Association (TOA), membership in which is restricted to optometrists who comply with the Code of Ethics of the AOA. Rogers and his fellow commercial optometrists are ineligible for membership in TOA because their business methods are at odds with the AOA Code of Ethics. In his complaint, Rogers alleged that he is deprived of equal protection and due process because he is eligible for only two of the six seats on the Board, and because he is subject to regulation by a Board composed primarily of members of the professional faction. Regarding § 5.13 (d), Rogers alleged that while the section prohibits optometrists from practicing under trade names, the prohibition is not extended to ophthalmologists. Rogers claimed that this disparity of treatment denies him the equal protection of the laws, as he is denied the right to conduct his optometrical practice as he has in the past under the name "Texas State Optical."

The three-judge District Court that was convened to consider Rogers' challenge to the constitutionality of the Texas law granted two motions to intervene. The TOA intervened as a defendant, adopting without alteration the position taken by the individual members of the Board whom Rogers originally named as defendants. The Texas Senior Citizens

---

by the Act that the Texas Legislature considers optometry to be a professional service requiring in the public interest a high level of knowledge and training.

Association (TSCA) intervened on behalf of Rogers. This intervenor claimed that its members have a Fourteenth Amendment right to representation of the general public on the Board, and that because § 2.02 subjects "commercial" optometrists to regulation by "professional" optometrists, the statute discourages optometrists from communicating truthful commercial information to TSCA members. The TSCA also urged that the prohibition of the practice of optometry under a trade name violates the First Amendment right of its members to receive information about the availability of optometrical services.

The District Court found that § 2.02 is related reasonably to the State's purpose of ensuring enforcement of the Act and therefore constitutional under the Equal Protection Clause. As to the claim that a Board dominated by professional optometrists would treat commercial optometrists unfairly, the District Court held that any claim that non-TOA members did not receive due process when called before the Board could be settled when and if the problem arose.[8]   Concluding that the proffered justifications for § 5.13 (d) were outweighed by the importance of the commercial speech in question, the District Court held § 5.13 (d) unconstitutional and enjoined its enforcement by the Board.

In No. 77–1164, Rogers and the TSCA appeal from the District Court's decision upholding the constitutionality of § 2.02.   In Nos. 77–1163 and 77–1186, the members of the Board other than Rogers, and the TOA, respectively, appeal from the decision striking down § 5.13 (d) as unconstitutional. We noted probable jurisdiction, 435 U. S. 967, and now affirm the decision in No. 77–1164 and reverse in Nos. 77–1163 and 77–1186.

_____

[8] The District Court also held that § 2.02 does not create a constitutionally impermissible irrebuttable presumption against nonmembers of TOA, and that its decision striking down the Act's prohibition of price advertising removed any danger that TOA's domination of the Board could be used to suppress truthful advertising by optometrists.

## II

In holding that § 5.13 (d) infringes First Amendment rights, the District Court relied primarily on this Court's decisions in *Bates* v. *State Bar of Arizona,* 433 U. S. 350 (1977), and *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council,* 425 U. S. 748 (1976.) A trade name is a form of advertising, it concluded, because after the name has been used for some time, people "identify the name with a certain quality of service and goods." It found specifically "that the Texas State Optical [TSO] name has come to communicate to the consuming public information as to certain standards of price and quality, and availability of particular routine services," and rejected the argument that the TSO name misleads the public as to the identity of the optometrists with whom it deals. Balancing the constitutional interests in the commercial speech in question against the State's interest in regulating it, the District Court held that the prohibition of the use of trade names by § 5.13 (d) is an unconstitutional restriction of the "free flow of commercial information." 438 F. Supp., at 431.

### A

A review of *Virginia Pharmacy* and *Bates* shows that the reliance on them by the court below, a reliance reasserted here by Rogers and the TSCA (the plaintiffs), was misplaced. At issue in *Virginia Pharmacy* was the validity of Virginia's law preventing advertising by pharmacists of the prices of prescription drugs. After establishing that the economic nature of the pharmacists' interest in the speech did not preclude First Amendment protection for their advertisements, the Court discussed the other interests in the advertisements that warranted First Amendment protection. To individual consumers, information about prices of prescription drugs at competing pharmacies "could mean the alleviation of physical pain or the enjoyment of basic necessities." 425 U. S., at 764. Society also has a strong interest in the free flow of com-

mercial information, both because the efficient allocation of resources depends upon informed consumer choices and because "even an individual advertisement, though entirely 'commercial,' may be of general public interest." *Ibid.* The Court acknowledged the important interest of the State in maintaining high standards among pharmacists, but concluded that this interest could not justify the ban on truthful price advertising when weighed against the First Amendment interests in the information conveyed.

In the next Term, the Court applied the rationale of *Virginia Pharmacy* to the advertising of certain information by lawyers. After weighing the First Amendment interests identified in *Virginia Pharmacy* against the State's interests in regulating the speech in question, the Court concluded that the truthful advertising of prices at which routine legal services will be performed also is protected by the First Amendment. *Bates.* v. *State Bar of Arizona, supra.*

In both *Virginia Pharmacy* and *Bates,* we were careful to emphasize that "[s]ome forms of commercial speech regulation are surely permissible." *Virginia Pharmacy, supra,* at 770; accord, *Bates, supra,* at 383. For example, restrictions on the time, place, or manner of expression are permissible provided that "they are justified without reference to the content of the regulated speech, that they serve a significant governmental interest, and that in so doing they leave open ample alternative channels for communication of the information." *Virginia Pharmacy, supra,* at 771. Equally permissible are restrictions on false, deceptive, and misleading commercial speech.

> "Untruthful speech, commercial or otherwise, has never been protected for its own sake. *Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323, 340 (1974); *Konigsberg* v. *State Bar,* 366 U. S. 36, 49, and n. 10 (1961). Obviously, much commercial speech is not provably false, or even wholly false, but only deceptive or misleading. We foresee no

obstacle to a State's dealing effectively with this problem. The First Amendment, as we construe it today, does not prohibit the State from insuring that the stream of commercial information flow cleanly as well as freely." *Id.*, at 771–772 (footnote omitted); accord, *Bates, supra,* at 383.

Regarding the permissible extent of commercial-speech regulation, the Court observed in *Virginia Pharmacy* that certain features of commercial speech differentiate it from other varieties of speech in ways that suggest that "a different degree of protection is necessary to insure that the flow of truthful and legitimate commercial information is unimpaired." 425 U. S., at 772 n. 24. Because it relates to a particular product or service, commercial speech is more objective, hence more verifiable, than other varieties of speech. Commercial speech, because of its importance to business profits, and because it is carefully calculated, is also less likely than other forms of speech to be inhibited by proper regulation. These attributes, the Court concluded, indicate that it is "appropriate to require that a commercial message appear in such a form . . . as [is] necessary to prevent its being deceptive. . . . They may also make inapplicable the prohibition against prior restraints." *Ibid.*; see *id.*, at 775–781 (STEWART, J., concurring).[9]

---

[9] The application of First Amendment protection to speech that does "no more than propose a commercial transaction," *Pittsburgh Press Co.* v. *Human Relations Comm'n*, 413 U. S. 376, 385 (1973), has been recognized generally as a substantial extension of traditional free-speech doctrine which poses special problems not presented by other forms of protected speech. Jackson & Jeffries, Commercial Speech: Economic Due Process and the First Amendment, 65 Va. L. Rev. 1 (1979); Note, 57 B. U. L. Rev. 833 (1977). Cf. Comment, First Amendment Protection for Commercial Advertising: The New Constitutional Doctrine, 44 U. Chi. L. Rev. 205 (1976). By definition, commercial speech is linked inextricably to commercial activity: while the First Amendment affords such speech "a limited measure of protection," it is also true that "the State does

## B

Once a trade name has been in use for some time, it may serve to identify an optometrical practice and also to convey information about the type, price, and quality of services offered for sale in that practice. In each role, the trade name is used as part of a proposal of a commercial transaction. Like the pharmacist who desired to advertise his prices in *Virginia Pharmacy*, the optometrist who uses a trade name "does not wish to editorialize on any subject, cultural, philosophical, or political. He does not wish to report any particularly newsworthy fact, or to make generalized observations even about commercial matters." *Id.*, at 761. His purpose is strictly business. The use of trade names in connection with optometrical practice, then, is a form of commercial speech and nothing more.[10]

---

not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity." *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447, 456 (1978). Because of the special character of commercial speech and the relative novelty of First Amendment protection for such speech, we act with caution in confronting First Amendment challenges to economic legislation that serves legitimate regulatory interests. Our decisions dealing with more traditional First Amendment problems do not extend automatically to this as yet uncharted area. See, *e. g.*, *id.*, at 462 n. 20 (overbreadth analysis not applicable to commercial speech). When dealing with restrictions on commercial speech we frame our decisions narrowly, "allowing modes of regulation [of commercial speech] that might be impermissible in the realm of noncommercial expression." *Id.*, at 456.

[10] In *First Nat. Bank of Boston* v. *Bellotti*, 435 U. S. 765 (1978), the state law at issue prohibited the bank from publicizing its views on the merits of a proposed state constitutional amendment that was to be submitted to a referendum. In holding that the statute was unconstitutional, the Court stated that free discussion of governmental affairs "is at the heart of the First Amendment's protection." *Id.*, at 776. Similarly in *Bigelow* v. *Virginia*, 421 U. S. 809, 822 (1975), the Court noted explicitly that the constitutionally protected advertisement "did more than simply propose a commercial transaction." Such speech is categorically different from

A trade name is, however, a significantly different form of commercial speech from that considered in *Virginia Pharmacy* and *Bates*. In those cases, the State had proscribed advertising by pharmacists and lawyers that contained statements about the products or services offered and their prices. These statements were self-contained and self-explanatory. Here, we are concerned with a form of commercial speech that has no intrinsic meaning. A trade name conveys no information about the price and nature of the services offered by an optometrist until it acquires meaning over a period of time by associations formed in the minds of the public between the name and some standard of price or quality.[11] Because these ill-defined associations of trade names

---

the mere solicitation of patronage implicit in a trade name. See n. 9, *supra*.

[11] A trade name that has acquired such associations to the extent of establishing a secondary meaning becomes a valuable property of the business, protected from appropriation by others. The value as a business asset of a trade name with secondary meaning has been recognized in the limitations imposed on the Federal Trade Commission's remedial powers under § 5 of the Federal Trade Commission Act, 15 U. S. C. § 45, which prohibits "unfair methods of competition." Because of the property value of trade names, the Court held in *FTC* v. *Royal Milling Co.*, 288 U. S. 212, 217–218 (1933), and *Jacob Siegel Co.* v. *FTC*, 327 U. S. 608, 611–613 (1946), that before prohibiting the use of a trade name under § 5, the FTC must determine that the deceptive or misleading use of the name cannot be remedied by any means short of its proscription. But a property interest in a means of communication does not enlarge or diminish the First Amendment protection of that communication. Accordingly, there is no First Amendment rule, comparable to the limitation on § 5, requiring a State to allow deceptive or misleading commercial speech whenever the publication of additional information can clarify or offset the effects of the spurious communication.

There is no claim in this case that Rogers or other optometrists practicing under trade names have been deprived of property without due process of law, or indeed that their property has been taken at all. Accordingly, we do not have occasion to consider whether § 5.13 (k), the limited grandfather clause applicable to § 5.13 (d), would defeat such claims.

with price and quality information can be manipulated by the users of trade names, there is a significant possibility that trade names will be used to mislead the public.

The possibilities for deception are numerous. The trade name of an optometrical practice can remain unchanged despite changes in the staff of optometrists upon whose skill and care the public depends when it patronizes the practice. Thus, the public may be attracted by a trade name that reflects the reputation of an optometrist no longer associated with the practice. A trade name frees an optometrist from dependence on his personal reputation to attract clients, and even allows him to assume a new trade name if negligence or misconduct casts a shadow over the old one. By using different trade names at shops under his common ownership, an optometrist can give the public the false impression of competition among the shops. The use of a trade name also facilitates the advertising essential to large-scale commercial practices with numerous branch offices, conduct the State rationally may wish to discourage while not prohibiting commercial optometrical practice altogether.

The concerns of the Texas Legislature about the deceptive and misleading uses of optometrical trade names were not speculative or hypothetical, but were based on experience in Texas with which the legislature was familiar when in 1969 it enacted § 5.13 (d). The forerunner of § 5.13 (d) was adopted as part of a "Professional Responsibility Rule" by the Texas State Board of Examiners in Optometry in 1959.[12]  In a deci-

---

[12] The Rule provided in part that no optometrist should practice under or use an assumed name in connection with his practice. Partners were allowed to practice under their full or last names, however, and optometrists employed by other optometrists could practice under their own names in an office listed in the names of their employers.

When the Texas Legislature enacted the Texas Optometry Act in 1969, it included the Professional Responsibility Rule, with only minor changes, as § 5.13 of the Act. The purpose of the legislature was to continue the

sion upholding the validity of the Rule, the Texas Supreme Court reviewed some of the practices that had prompted its adoption. *Texas State Bd. of Examiners in Optometry* v. *Carp,* 412 S. W. 2d 307, appeal dismissed and cert. denied, 389 U. S. 52 (1967). One of the plaintiffs in that case, Carp, operated 71 optometrical offices in Texas under at least 10 different trade names. From time to time, he changed the trade names of various shops, though the licensed optometrists practicing in each shop remained the same. He purchased the practices of other optometrists and continued to practice under their names, even though they were no longer associated with the practice. In several instances, Carp used different trade names on offices located in close proximity to one another and selling the same optical goods and services. The offices were under common management, and had a common staff of optometrists, but the use of different trade names facilitated advertising that gave the impression of competition among the offices.

The Texas court found that Carp used trade names to give a misleading impression of competitive ownership and management of his shops. It also found that Rogers, a party to this suit and a plaintiff in *Carp,* had used a trade name to convey the impression of standardized optometrical care. All 82 of his shops went under the trade name "Texas State Optical" or "TSO," and he advertised "scientific TSO eye examination[s]" available in every shop. 412 S. W. 2d, at 312. The TSO advertising was calculated as well, the court found, to give "the impression that [Rogers or one of his brothers] is present at a particular office. Actually they have

_____

protection of the public from false, deceptive, and misleading practices by optometrists, as the preamble to § 5.13 makes clear.

"The provisions of this section are adopted in order to protect the public in the practice of optometry, better enable members of the public to fix professional responsibility, and further safeguard the doctor-patient relationship."

neither been inside nor seen some of their eighty-two offices distributed generally over Texas." *Id.*, at 313. Even if Rogers' use and advertising of the trade name were not in fact misleading, they were an example of the use of a trade name to facilitate the large-scale commercialization which enhances the opportunity for misleading practices.[13]

It is clear that the State's interest in protecting the public from the deceptive and misleading use of optometrical trade names is substantial and well demonstrated.[14] We are convinced that § 5.13 (d) is a constitutionally permissible state regulation in furtherance of this interest. We emphasize, in so holding, that the restriction on the use of trade names has

---

[13] Although the individual defendants and the TOA (collectively, the defendants) rely primarily on *Carp* to establish the history of false and misleading uses of optometrical trade names, some evidence of such practices also was included in the deposition testimony presented to the District Court. A former associate of Carp's testified to some of the trade-name abuses that had occurred in their business. Shannon Deposition 8. Rogers' testimony showed that the "Texas State Optical" name was used by offices wholly owned by him, partly owned by him, and by offices in which he had no ownership interest. The dissenting opinion states that the "Rogers organization is able to offer and enforce a degree of uniformity in care at all its offices . . . ." *Post*, at 21. This was not Rogers' testimony. He stated that he exercised "no control whatsoever" over "office policy routines" in those TSO offices in which he owned no interest. Rogers Deposition 16. It appears from Rogers' testimony that his primary business relationship with such offices was their participation in the TSO advertising and their purchase of materials and equipment from his supply house. *Id.*, at 16–18, 22–23.

[14] The plaintiffs argue that the fact that the public might be subject to similar deception by optometrists who do not use trade names but practice in partnerships or with numerous employees shows that the State actually was not concerned with misleading and deceptive practices when it enacted § 5.13 (d). The plaintiffs have not attempted to show, however, that any of the demonstrated abuses associated with the use of trade names also has occurred apart from their use. Tr. of Oral Arg. 29. There is no requirement that the State legislate more broadly than required by the problem it seeks to remedy. See *Williamson* v. *Lee Optical Co.*, 348 U. S. 483, 489 (1955).

only the most incidental effect on the content of the commercial speech of Texas optometrists. As noted above, a trade name conveys information only because of the associations that grow up over time between the name and a certain level of price and quality of service. Moreover, the information associated with a trade name is largely factual, concerning the kind and price of the services offered for sale. Since the Act does not prohibit or limit the type of informational advertising held to be protected in *Virginia Pharmacy* and *Bates,* the factual information associated with trade names may be communicated freely and explicitly to the public. An optometrist may advertise the type of service he offers, the prices he charges,[15] and whether he practices as a partner, associate, or employee with other optometrists.[16] Rather than stifling commercial speech, § 5.13 (d) ensures that information regarding optometrical services will be communicated more fully and accurately to consumers than it had been in the past when optometrists were allowed to convey the information through unstated and ambiguous associations with a trade name. In sum, Texas has done no more than require that commercial information about optometrical services "appear in such a form . . . as [is] necessary to prevent its being deceptive." *Virginia Pharmacy,* 425 U. S., at 772 n. 24.[17]

---

[15] As adopted, § 5.09 of the Act proscribed price advertising by optometrists. But the court below invalidated that prohibition, and its ruling has not been appealed. See n. 1, *supra.*

[16] As stated *supra,* at 4–5, § 5.13 allows an optometrist to associate his name only with an office in which he practices. § 5.13 (e).

[17] Rogers did not produce any evidence in support of his claim that § 5.13 (d) violates his right to equal protection of the laws because it does not apply to ophthalmologists. Even assuming what Rogers did not demonstrate, that ophthalmologists are in fact free of any regulation comparable to § 5.13 (d), the uncontested evidence of the defendants showed that the regulations contained in that section are a response to the particular history of the business of optometry. *E. g.,* Friedman Deposition 138–142; Tr. of Oral Arg. 5. The plaintiffs did not attempt to show

## III

We stated the applicable constitutional rule for reviewing equal protection challenges to local economic regulations such as § 2.02 in *New Orleans* v. *Dukes,* 427 U. S. 297, 303 (1976).

"When local economic regulation is challenged solely as violating the Equal Protection Clause, this Court consistently defers to legislative determinations as to the desirability of particular statutory discriminations. See, *e. g., Lehnhausen* v. *Lake Shore Auto Parts Co.,* 410 U. S. 356 (1973). Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest."

The history of the Act shows that § 2.02 is related reasonably to the State's legitimate purpose of securing a Board that will administer the Act faithfully.

Prior to 1967, the TOA dominated the State Board of Examiners; during that period, the State Board adopted various rules for the regulation of the optometrical profession, including the Professional Responsibility Rule. Between 1967 and 1969, the commercial optometrists secured a majority on the State Board and took steps to repeal the Professional Responsibility Rule. This precipitated a legislative struggle between the commercial and professional optom-

---

that there was any comparable history of the use of trade names by ophthalmologists.

Because we conclude that § 5.13 (d) is a constitutionally permissible restriction on deceptive and misleading commercial speech, we need not consider the other justifications for the statute suggested by the defendants. We leave for another day the question whether § 5.13 (d) is affected by recently promulgated regulations of the Federal Trade Commission concerning the advertising of ophthalmic goods and services. 43 Fed. Reg. 23992 (1978).

etrists which ended in the passage of the Act in 1969. At that time the legislature enacted into law, with certain modifications, the Professional Responsibility Rule long supported by the TOA, and created the Board to administer the Act. In view of its experience with the commercial and professional optometrists preceding the passage of the Act,[18] it was reasonable for the legislature to require that a majority of the Board be drawn from a professional organization that had demonstrated consistent support for the rules that the Board would be responsible for enforcing. Nor is there any constitutional basis for TSCA's due process claim that the legislature is required to place a representative of consumers on the Board.[19]

Although Rogers has no constitutional right to be regulated by a Board that is sympathetic to the commercial practice of optometry, he does have a constitutional right to a fair and impartial hearing in any disciplinary proceeding conducted against him by the Board. *Gibson* v. *Berryhill*, 411 U. S. 564 (1973); *Wall* v. *American Optometric Assn.*, 379 F. Supp. 175 (ND Ga.), summarily aff'd *sub nom. Wall* v. *Hardwick*, 419 U. S. 888 (1974). In both *Gibson* and *Wall*, however, disciplinary proceedings had been instituted against the plaintiffs, and the courts were able to examine in a particular context the possibility that the members of the regulatory board might have personal interests that precluded a fair and impartial hearing of the charges. Finding the presence of such prejudicial interests, it was appropriate for the courts to enjoin further proceedings against the plaintiffs. *E. g., Gibson, supra,*

---

[18] Riley Deposition, App. A-209 to A-236, A-251 to A-252.

[19] The Due Process Clause imposes only broad limits, not exceeded here, on the exercise by a State of its authority to regulate its economic life, and particularly the conduct of the professions. *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447 (1978); *North Dakota Pharmacy Board* v. *Snyder's Drug Stores, Inc.*, 414 U. S. 156, 164–167 (1973); *Williamson* v. *Lee Optical Co.*, 348 U. S. 483, 487–488 (1955). Cf. *Weinberger* v. *Salfi*, 422 U. S. 749, 767–774 (1975).

at 570, 578–579   In contrast, Rogers' challenge to the fairness of the Board does not arise from any disciplinary proceeding against him.[20]

## IV

The portion of the District Court's judgment appealed from in No. 77–1164, sustaining the constitutionality of § 2.02, is affirmed.   That part of the District Court's judgment appealed from in Nos. 77–1163 and 77–1186, declaring § 5.13 (d) unconstitutional insofar as it proscribes the use of trade names by optometrists, is reversed.   The case is remanded with instructions to dissolve the injunction against the enforcement of § 5.13 (d).

*So ordered.*

MR. JUSTICE BLACKMUN, with whom MR. JUSTICE MARSHALL joins, concurring in part and dissenting in part.

I join Part III of the Court's opinion and its judgment of affirmance with respect to No. 77–1164 (the § 2.02, or Texas Optometry Board composition, issue).   I dissent, however, from Part II of the Court's opinion and from its judgment of reversal with respect to Nos. 77–1163 and 77–1186 (the § 5.13 (d), or trade-name, issue).

I do not agree with the Court's holding that the Texas Optometry Act's § 5.13 (d), which bans the use of a trade name "in connection with" the practice of optometry in the State, is constitutional.   In my view, the Court's restricted

---

[20] Since there is no support in the record for TSCA's speculation that the TOA members on the Board will act in excess of their authority by discouraging lawful advertising by optometrists, there is no merit in TSCA's claim that § 2.02 violates its members' First Amendment rights by creating a Board with a majority drawn from the TOA.   The claim of the plaintiffs that § 2.02 is inconsistent with § 1 of the Sherman Antitrust Act, 15 U. S. C. § 1, was neither alleged in the District Court nor mentioned in the jurisdictional statement in this Court.   The plaintiffs' attempt to raise the issue in their brief in No. 77–1164 does not put the question properly before us.

analysis of the nature of a trade name overestimates the potential for deception and underestimates the harmful impact of the broad sweep of § 5.13 (d). The Court also ignores the fact that in Texas the practice of "commercial" optometry is *legal*. It has never been outlawed or made illegal. This inescapable conclusion is one of profound importance in the measure of the First Amendment rights that are asserted here. It follows, it seems to me, that Texas has abridged the First Amendment rights not only of Doctor Rogers but also of the members of the intervenor-plaintiff Texas Senior Citizens Association by absolutely prohibiting, without reasonable justification, the dissemination of truthful information about wholly legal commercial conduct.

I

The First Amendment protects the "free flow of commercial information." *Virginia Pharmacy Board* v. *Virginia Consumer Council,* 425 U. S. 748, 764 (1976). It prohibits a State from banning residential "For Sale" signs, *Linmark Associates, Inc.* v. *Willingboro,* 431 U. S. 85 (1977), or from disciplining lawyers who advertise the availability of routine professional services, *Bates* v. *State Bar of Arizona,* 433 U. S. 350 (1977), or from preventing pharmacists from disseminating the prices at which they will sell prescription drugs, *Virginia Pharmacy Board, supra.* In each of these cases, the Court has balanced the public and private interests that the First Amendment protects against the justifications proffered by the State. Without engaging in any rigid categorization of the degree of scrutiny required, the Court has distinguished between permissible and impermissible forms of state regulation.[1]

In 1976, Texas had 934 resident licensed optometrists divided almost evenly between "professional" and "commer-

---

[1] See Canby & Gellhorn, Physician Advertising: The First Amendment and the Sherman Act, 1978 Duke L. J. 543, 552–554.

cial" factions. Rogers is the leader of the commercial forces. He and his associates operate more than 100 optometry offices. Before the enactment of § 5.13 (d) in 1969, their offices used, and where still allowed by a grandfather provision, § 5.13 (k) (which, but for the decision of the District Court, would have expired on January 1, 1979), continue to use, the name Texas State Optical, or TSO. An optometrist who agrees to participate with Rogers in his organization must obey an elaborate set of restrictions on pain of termination. He must purchase all inventory and supplies from Rogers Brothers; do all laboratory work at their laboratory; abide by their policies concerning the examination of patients; take patients on a first-come-first-served basis rather than by appointment; and retain Rogers Brothers at 4% of net cash to do all accounting and advertising. App. A–71 to A–98. As a result of these and other rules, the Rogers organization is able to offer and enforce a degree of uniformity in care at all its offices along with other consumer benefits, namely, sales on credit, adjustment of frames and lenses without cost, one-stop care, and transferability of patient records among Texas State Optical offices.[2] The TSO chain typifies commercial optometry, with its emphasis on advertising, volume, and speed of service.

The Court today glosses over the important private and public interests that support Rogers' use of his trade name.

---

[2] Rogers owns some Texas State Optical offices; in others he is merely a partner; and in still others he has no financial interest other than licensing the TSO trade name and selling optical supplies and services to the "associated" optometrist. The Court, *ante*, at 15 n. 13, relies on Rogers' deposition testimony to suggest that he exerts no control at all over associated offices. The representative contract introduced into evidence, however, requires that, as a condition of using the TSO trade name, the licensee must operate the office in accord with TSO policy and purchase all optical material from Rogers Brothers Laboratory. App. A–82 to A–83. See Brief for Appellee Texas Optometric Association, Inc., in No. 77–1164, pp. 16–18. The parties do not question the District Court's factual finding that the TSO trade name is associated with certain standards of quality. See *infra*, at 23.

For those who need them, eyeglasses are one of the "basic necessities" of life in which a consumer's interest "may be as keen, if not keener by far, than his interest in the day's most urgent political debate." *Virginia Pharmacy Board,* 425 U. S., at 763–764. For the mobile consumer, the Rogers trade name provides a valuable service.[3] Lee Kenneth Benham, a professor and economist whose studies in this area have been relied upon by the Federal Trade Commission,[4] testified in a deposition which is part of the record here:

"One of the most valuable assets which individuals have in this large mobile country is their knowledge about trade names. Consumers develop a sophisticated understanding of the goods and services provided and the prices associated with different trade names. This permits them to locate the goods, services, and prices they prefer on a continuing basis with substantially lower search costs than would otherwise be the case. This can perhaps be illustrated by pointing out the information provided by such names as Sears, Neiman Marcus or Volkswagen. This also means that firms have an enormous incentive to develop and maintain the integrity of the products and services provided under their trade name: the entire

---

[3] Trade names are a vital form of commercial speech. It has even been suggested that commercial speech can be defined as "speech referring to a brand name product or service that is not itself protected by the first amendment, issued by a speaker with a financial interest in the sale of the product or service or in the distribution of the speech." Comment, First Amendment Protection for Commercial Advertising: The New Constitutional Doctrine, 44 U. Chi. L. Rev. 205, 254 (1976).

[4] The Federal Trade Commission has promulgated a rule pre-empting certain state laws that restrict advertising of ophthalmic goods and services. 43 Fed. Reg. 24006 (1978). The Commission's statement of basis and purpose characterizes the Benham studies as "reliable." *Id.,* at 23995. See Benham, The Effect of Advertising on the Price of Eyeglasses, 15 J. Law & Econ. 337 (1972); Benham & Benham, Regulating Through the Professions: A Perspective on Information Control, 18 J. Law & Econ. 421 (1975).

package they offer is being judged continuously by consumers on the basis of the samples they purchase." App. A–336.

And the District Court found in this case that "the Texas State Optical name [TSO] has come to communicate to the consuming public information as to certain standards of price and quality, and availability of particular routine services." 438 F. Supp. 428, 431 (ED Tex. 1977).

The Rogers trade name also serves a distinctly public interest. To that part of the general public that is not then in the market for eye care, a trade name is the distinguishing characteristic of the commercial optometrist. The professional faction does not use trade names. Without trade names, an entirely legal but regulated mode of organizing optometrical practice would be banished from that public's view. The appellants in Nos. 77–1163 and 77–1186 do not argue that the Rogers partnership contracts run afoul of any statute other than § 5.13 (d). The Act, indeed, explicitly approves other incidents of commercial optometry, including the leasing of space on a percentage basis, § 5.13 (b); the hiring of professional employees without regard to supervision, § 5.13 (c); and the leasing of space in mercantile establishments, § 5.14. The Texas Optometry Act, with limited exceptions in § 5.09 (a), does not prohibit advertising. Yet § 5.13 (d) will bar Rogers from telling both consumers and the rest of the public that the TSO organization even exists. It totally forbids the use of a trade name "in connection with his practice of optometry." [5]

The political impact of forcing TSO out of the public view cannot be ignored. Under the Texas Sunset Act, the Texas Optometry Act will expire September 1, 1981. Tex. Rev. Civ. Stat. Ann., Art. 4552–2.01a (Vernon Supp. 1978–1979). By

---

[5] Rogers may not even inform the public that he is associated with any 1 of the more than 100 offices his organization controls, unless he spends a specified amount of his practice time at that office. See § 5.13 (e).

preventing TSO from advertising its existence, the State has struck a direct blow at Rogers' ability to campaign for the re-enactment of the portions of the statute he favors, and for the demise of those, such as § 2.02, that he finds objectionable. The citizen is more likely to pay attention to the head of a statewide organization whose reputation is known than to an optometrist whose influence is obscurely perceived.

## II

The Court characterizes as "substantial and well demonstrated" the state interests offered to support suppression of this valuable information. *Ante,* at 15. It first contends that because a trade name has no intrinsic meaning, it can cause deception. The name may remain unchanged, it is pointed out, despite a change in the identities of the optometrists who employ it. Secondly, the Court says that the State may ban trade names to discourage commercial optometry while stopping short of prohibiting it altogether. Neither of these interests justifies a statute so sweeping as § 5.13 (d).

## A

Because a trade name has no intrinsic meaning, it cannot by itself be deceptive. A trade name will deceive only if it is used in a misleading context. The hypotheticals posed by the Court, and the facts of *Texas State Bd. of Examiners in Optometry* v. *Carp,* 412 S. W. 2d 307 (Tex.), appeal dismissed and cert. denied, 389 U. S. 52 (1967), concern the use of optometric trade names in situations where the name of the practicing optometrist is kept concealed. The deception lies not in the use of the trade name, but in the failure simultaneously to disclose the name of the optometrist. In the present case, counsel for the State conceded at oral argument that § 5.13 (d) prohibits the use of a trade name even when the optometrist's name is also prominently displayed. Tr. of Oral Arg. 39. It thus prohibits wholly truthful speech that

is entirely removed from the justification on which the Court most heavily relies to support the statute.

The Court suggests that a State may prohibit "misleading commercial speech" even though it is "offset" by the publication of clarifying information. *Ante,* at 12 n. 11. Corrected falsehood, however, is truth, and, absent some other regulatory justification, a State may not prohibit the dissemination of truthful commercial information. By disclosing his individual name along with his trade name, the commercial optometrist acts in the spirit of our First Amendment jurisprudence, where traditionally "the remedy to be applied is more speech, not enforced silence." *Linmark Associates, Inc.* v. *Willingboro,* 431 U. S., at 97, quoting *Whitney* v. *California,* 274 U. S. 357, 377 (1927) (Brandeis, J., concurring).[6] The ultimate irony of the Court's analysis is that § 5.13 (d), because of its broad sweep, actually encourages deception. That statute, in conjunction with § 5.13 (e),[7] prevents the consumer from ever

---

[6] The Court's prior cases reviewing orders of the Federal Trade Commission have recognized that, when a trade name is alleged to be deceptive, the deception can be cured by "requiring proper qualifying words to be used in immediate connection with the names." *FTC* v. *Royal Milling Co.,* 288 U. S. 212, 217 (1933); see *Jacob Siegel Co.* v. *FTC,* 327 U. S. 608, 611–613 (1946). The Court would distinguish these cases, *ante,* at 12 n. 11, on the ground that the corporate interest protected there arose under the Fifth Amendment rather than the First. No justification for that distinction is offered.

[7] Section 5.13 in pertinent part reads:

"(e) No optometrist shall use, cause or allow to be used, his name or professional identification, as authorized by Article 4590e, as amended, Revised Civil Statutes of Texas, on or about the door, window, wall, directory, or any sign or listing whatsoever, of any office, location or place where optometry is practiced, unless said optometrist is actually present and practicing optometry therein during the hours such office, location or place of practice is open to the public for the practice of optometry.

.      .      .      .      .

"(g) The requirement of Subsections (e) and (f) of this section that an optometrist be 'actually present' in an office, location or place of

discovering that Rogers controls and in some cases employs the optometrist upon whom the patient has relied for care. In effect, the statute conceals the fact that a particular practitioner is engaged in commercial rather than professional optometry, and so deprives consumers of information that may well be thought relevant to the selection of an optometrist.

## B

The second justification proffered by the Court is that a State, while not prohibiting commercial optometry practice altogether, could ban the use of trade names in order to discourage commercial optometry. Just last Term, however, the Court rejected the argument that the States' power to create, regulate, or wind up a corporation by itself could justify a restriction on that corporation's speech. See *First Nat. Bank of Boston* v. *Bellotti,* 435 U. S. 765, 780 n. 16 (1978). Moreover, this justification ignores the substantial First Amendment interest in the dissemination of truthful information about legally available professional services. See *Bigelow* v. *Virginia,* 421 U. S. 809, 822–825 (1975). It is not without

---

practice holding his name out to the public shall be deemed satisfied if the optometrist is, as to such office, location or place of practice, either:

"(1) physically present therein more than half the total number of hours such office, location, or place of practice is open to the public for the practice of optometry during each calendar month for at least nine months in each calendar year; or

"(2) physically present in such office, location, or place of practice for at least one-half of the time such person conducts, directs, or supervises any practice of optometry.

"(h) Nothing in this section shall be interpreted as requiring the physical presence of a person who is ill, injured, or otherwise incapacitated temporarily."

As indicated by the Court's opinion, *ante,* at 16, and n. 16, an optometrist may not advertise that he is the employee of another optometrist unless the employer is "actually present and practicing" at the same location with the employee. Conversely, when the employer's name can be advertised, the employee's name need not be mentioned.

significance that most of the persons influenced by a trade name are those who, by experience or by reputation, know the quality of service for which the trade name stands. The determination that banning trade names would discourage commercial optometry, therefore, necessarily relies on an assumption that persons previously served thought that the trade-name practitioner had performed an acceptable service. If the prior experience had been bad, the consumer would want to know the trade name in order to avoid those who practice under it. The first and second stated purposes of § 5.13 are "to protect the public in the practice of optometry," and to "better enable members of the public to fix professional responsibility." These purposes are ill-served by a statute that hinders consumers from enlisting the services of an organization they have found helpful, and so, in effect, prevents consumers from protecting themselves.

The Court repeatedly has rejected the "highly paternalistic" approach implicit in this justification. See *First Nat. Bank of Boston* v. *Bellotti,* 435 U. S., at 791 n. 31. There is nothing about the nature of an optometrist's services that justifies adopting an approach of this kind here. An optometrist's duties are confined by the statute, § 1.02 (1), to measuring the powers of vision of the eye and fitting corrective lenses. See *Williamson* v. *Lee Optical Co.,* 348 U. S. 483, 486 (1955) (defining terms). The optometrist does not treat disease. His service is highly standardized. Each step is controlled by statute. § 5.12. Many of his functions are so mechanical that they can be duplicated by machines that would enable a patient to measure his own vision.[8] Patients participate in the refraction process, and they frequently can easily assess

---

[8] See Bannon, A New Automated Subjective Optometer, 54 Am. J. Optometry & Phys. Optics 433 (1977); Guyton, Automated refraction, 13 Invest. Ophthalmology 814 (1974); Marg, Anderson, Chung, & Neroth, Computer-Assisted Eye Examination VI. Identification and Correction of Errors in the Refractor III System for Subjective Examination, 55 Am. J. Optometry & Phys. Optics 249 (1978).

the quality of service rendered. The cost per visit is low enough—$15 to $35—that comparison shopping is sometimes possible  See App. A–420.  Because more than half the Nation's population uses eyeglasses, 43 Fed. Reg. 23992 (1978), reputation information is readily available.  In this context, the First Amendment forbids the choice which Texas has made to shut off entirely the flow of commercial information to consumers who, we have assumed, "will perceive their own best interests if only they are well enough informed." *Virginia Pharmacy Board,* 425 U. S., at 770.

Because § 5.13 (d) absolutely prohibits the dissemination of truthful information about Rogers' wholly legal commercial conduct to consumers and a public who have a strong interest in hearing it, I would affirm the District Court's judgment holding that § 5.13 (d) is unconstitutional.