REYNA, Circuit Judge,
dissenting.
The Majority holds today that. Mr. Tam’s speech, which disparages those of Asian descent, is valuable political speech that the government may not regulate except to ban its use in commerce by everyone but Mr. Tam. I believe the refusal to register disparaging marks under § 2(a) of the Lanham Act is an appropriate regulation that directly advances the government’s substantial interest in the orderly flow of commerce. Because I would uphold the constitutionality of § 2(a), I respectfully dissent.
Trademarks are commercial speech. And precisely because trademarks are commercial speech, the government’s decision to grant or deny registration must be reviewed under an intermediate standard of scrutiny. Intermediate scrutiny is satisfied whenever the decision is narrowly tailored to directly advance a substantial government interest. When the commercial or political content of a trademark threatens the government’s substantial interest in the orderly flow of commerce, appropriate regulation may be justified.
Discussion
A. Intermediate Scrutiny Applies Because Trademarks Are Commercial Speech
The Supreme Court has held that trademarks are “a form of commercial speech and nothing more.” Friedman v. Rogers, 440 U.S. 1, 11, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979); accord San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm., 483 U.S. 522, 563, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987). The purpose of a trademark is merely to “propos[e] a commercial transaction” by identifying the source of goods or services. Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm’n of New York, 447 U.S. 557, 562, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).
Because “the Constitution accords less protection to commercial speech than to other constitutionally safeguarded forms of expression,” Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 64-65, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983), the government may regulate the use of trademarks to ensure the orderly flow of commerce. For example, the government may disallow trade names that create “[t]he possibilities for deception,” even if the names are not untruthful. Friedman, 440 U.S. at 13, 99 S.Ct. 887. The government may similarly implement, a trademark registration program, as it did through the Lanham Act, which provides certain speakers exclusive rights to their chosen marks in commerce. Such regulation is permissible under the First Amendment only because the speech being regulated is commercial and because the government has a substantial interest in facilitating commerce by “insuring that the stream of commercial information flows 'cleanly as well as freely.” Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 771-72, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976).
*1377 The courts have long recognized that some trademarks can include expressive elements concerning matters of public interest, and that such trademarks nevertheless remain commercial speech. Historically, commercial speech received no First Amendment protection, see Valentine v. Chrestensen, 316 U.S. 52, 54, 62 S.Ct. 920, 86 L.Ed. 1262 (1942), and the seminal cases bringing commercial speech within the First Amendment’s purview did so, at least in part, because commercial speech often communicates on matters of public interest. Virginia State Bd., 425 U.S. at 764-65, 96 S.Ct. 1817. As the Supreme Court recognized in Virginia State Board, “not all commercial messages contain the same or even a very great public interest element,” but “[t]here are few to which such an element, however, could not be added.” Id.
The protections of commercial speech are therefore based, at least in part, on the recognition that commercial speech is not always entirely commercial, but that it may contain political messages that make the speech “ ‘commercial’ in widely varying degrees.” Bigelow v. Virginia, 421 U.S. 809, 826, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975). For this reason, the Supreme Court has routinely held that various examples of speech “constitute commercial speech notwithstanding the fact that they contain discussions of important public issues.” Bolger, 463 U.S. at 67, 103 S.Ct. 2875; see also Bd. of Trustees of State Univ. of New York v. Fox, 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989). Put simply, commercial speech does not transform into core political speech with full First Amendment protections simply because it “links a product to a current public debate.” Cent. Hudson, 447 U.S. at 563, 100 S.Ct. 2343.
To determine whether speech is commercial, we consider “the nature of the speech taken as a whole.” Riley v. Nat’l Fed’n of the Blind, 487 U.S. 781, 796, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988). For example, in Bolger, the Supreme Court found that certain pamphlets were commercial speech, despite containing “discussions of important public issues,” because (1) the speaker conceded that the pamphlets were advertisements, (2) the pamphlets referenced a specific product, and (3) the speaker had an economic motivation for mailing the pamphlets. Bolger, 463 U.S. at 66-68, 103 S.Ct. 2875. The Court concluded that “[t]he combination of all these characteristics” supported the conclusion that “the informational pamphlets are properly characterized as commercial speech.” Id.
All three factors from Bolger are necessarily also present in trademarks. Trademarks are used to identify specific products and to advertise the sources of those products. Trademarks, and in particular those federally registered for exclusive use in interstate commerce, are necessarily tools of commerce used with an “economic motive.”[1] A trademark is therefore commercial speech, and as such, it lacks full First Amendment protections, regardless of whether it also includes a political element.
The Majority reasons that because the commercial and political elements of trademarks are “inextricably intertwined,” the combined whole must be treated as expressive speech. Maj. Op. at 1339 (citing Riley, 487 U.S. at 796, 108 S.Ct. 2667). But as explained above, commercial speech *1378 is frequently intertwined with political elements, and this intertwining does not necessarily alter the essentially commercial character of the speech. Riley, on which the Majority relies, is not to the contrary. Riley only reiterates that “in deciding what level of scrutiny to apply” we must consider “the nature of the speech taken as a whole.” Riley, 487 U.S. at 796, 108 S.Ct. 2667. The nature of trademarks seeking federal registration for use in interstate commerce, when considered as a whole, is indisputably commercial, not political.
Judge Dyk concurs in the result today only because he believes the content of Mr. Tam’s mark is so “indisputably expressive” that it cannot be regulated under the lesser standards applied to commercial speech. Dyk, J., concurring at 1373-74. But if the expressive content of the mark precludes regulation, on what authority may the government grant Mr. Tam the exclusive right to use this mark in commerce? Whatever standard of scrutiny protects the content of Mr. Tam’s trademark from government regulation, that same standard must necessarily be overcome by the government’s substantial interest in the orderly flow of commerce, or no trademark could issue.
B. Intermediate Scrutiny Applies Because Section 2(a) is Contenb-N eutral
The Majority applies strict scrutiny not necessarily because of the expressive content of Mr. Tam’s mark, but because of the government’s supposed purpose of suppressing the political elements of the mark. Maj. Op. at 1337-39. The Majority thus invokes the modern test for content-neutrality, under which the “principal inquiry” is “whether the government has adopted a regulation of speech because of disagreement with the message it conveys.” Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). Under Ward, “[t]he government’s purpose is the controlling consideration.” Id. The Supreme Court has endorsed the applicability of this test to commercial speech. Sorrell v. IMS Health Inc., — U.S. -, 131 S.Ct. 2653, 2664, 180 L.Ed.2d 544 (2011).
If this appeal turns on a content-neutrality analysis, we should be clear that the government has never stated that the purpose of § 2(a) is to suppress speech. Only the Majority has advanced this rationale, and it has done so only by default after eliminating all other interests of which it could conceive. I do not think we need to search so hard and so far. The purpose of § 2(a) is the same as the purpose of the Lanham Act as a whole — to promote the orderly flow of commerce.
The Lanham Act declares unequivocally that “[t]he intent of this chapter is to regulate commerce.” 15 U.S.C.A. § 1127. In analyzing content-neutrality, an apparently content-based law is nevertheless considered content-neutral if the government’s purpose is not to suppress speech, but to address the harmful secondary effects of that speech. See City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986); Young v. Am. Mini Theatres, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). The Supreme Court has repeatedly applied this “Secondary Effects” doctrine to uphold not only time, place, and manner restrictions on particular types of speech, id. (upholding regulations on.the locations of adult businesses), but also regulations on the content of expression itself, see, e.g., City of Erie v. Pap’s A.M., 529 U.S. 277, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (upholding ban on fully nude dancing); Barnes v. Glen Theatre, 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (same). For example, applying Ward, the Supreme Court upheld a city’s ban on fully nude dancing *1379 because the ban was only a minimal burden on speech and was narrowly tailored to advance the “substantial government interest in protecting order and morality.” Barnes, 501 U.S. at 569, 111 S.Ct. 2456. In City of Erie, the Court upheld a nearly identical statute as content-neutral because it did “not attempt to regulate the primary effects of the expression” but rather, “the secondary effects, such as impacts on public health, safety, and welfare.” City of Erie, 529 U.S. at 291, 120 S.Ct. 1382.
The Supreme Court has also permitted regulation of speech based on the speech’s effect on commerce. For instance, it was under Ward that the Supreme Court upheld the FCC’s must-carry provisions as content-neutral, despite the provisions’ mandate that cable providers transmit particular types of content. Turner Broad. Sys., Inc. v. F.C.C., 512 U.S. 622, 647, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). The Court upheld the must-carry regulations because they furthered the substantial government interest in “protecting non-cable households from loss of regular television broadcasting service.” Id. The Court has also upheld regulations on highly-protected private speech where the government sought to eliminate the secondary effects of that speech on the market for illegal goods. See Osborne v. Ohio, 495 U.S. 103, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990). Thus, when a regulation’s purpose is to address the secondary effects of certain speech, intermediate scrutiny is appropriate, even if the regulation implicates content.
Section 2(a) serves the same substantial government interest as the Lanham Act as a whole — the orderly flow of commerce. Commercial speech that insults groups of people, particularly based on their race, gender, religion, or other demographic identity, tends to disrupt commercial activity and to undermine the stability of the marketplace in much the same manner as discriminatory conduct. The government’s refusal to promote such speech in commerce is not an effort to suppress free expression, but to mitigate the disruptive secondary effects that a particular type of low-value speech may have when used in a commercial context. Because the government’s purpose is to mitigate these secondary effects on commerce rather than to suppress speech, the regulation is content-neutral and intermediate scrutiny applies.
C. Section 2(a) Advances the Substantial Government Interest in the Orderly Flow of Commerce
The government’s interest in the orderly flow of commerce is substantial.- If it were not, the government would be powerless to implement a trademark registry because doing so necessarily requires a ban on infringing commercial speech. The government has a substantial interest in regulating “deceptive or misleading” commercial speech, even if that speech is not wholly false, because of the government’s substantial interest in “insuring that the stream of commercial information flow cleanly as well as freely.” Virginia State Bd. of Pharmacy, 425 U.S. at 771, 96 S.Ct. 1817. The Supreme Court has never held, however, that deceptive and misleading speech is the only type of commercial speech subject to regulation for its disruptive effect. See Cent. Hudson, 447 U.S. at 566, 100 S.Ct. 2343 (“For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading.”) (emphasis added). Instead, any speech that substantially undermines the orderly flow of commerce may potentially be subject to at least some regulation.
The marketplace of ideas differs dramatically from the marketplace of goods and services. While the marketplace of ideas *1380 may tolerate or even benefit from the volatility that accompanies disparaging and insulting speech, the marketplace of goods and services is a wholly different animal. Commerce does not benefit from political volatility, nor from insults, discrimination, or bigotry. Commerce is a communal institution regulated for the mutual economic benefit of all. Commercial speech that discredits or brings reproach upon groups of Americans, particularly based on their race, has a discriminatory impact that undermines commercial activity and the stability of the marketplace in much the same manner as discriminatory conduct.
That discriminatory conduct disrupts commerce is long established. In upholding Title II of the Civil Rights Act, for example, the Supreme Court noted a record “replete with testimony of the burdens placed on interstate commerce by racial discrimination.” Katzenbach v. McClung, 379 U.S. 294, 299, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964). The Court cited an “impressive array of testimony that discrimination in restaurants had a direct and highly restrictive effect upon interstate travel,” and that such discrimination therefore “obstructs interstate commerce.” Id. at 300, 85 S.Ct. 377. It cited “many references” to discrimination causing “a depressant effect on general business conditions in the respective communities” and it noted evidence that discrimination “deterred professional, as well as skilled, people from moving into areas where such practices occurred and thereby caused industry to be reluctant to establish there.” Id. The Court thus found “ample basis for the conclusion that established restaurants in such areas sold less interstate goods because of the discrimination, that interstate travel was obstructed directly by it, that business in general suffered and that many new businesses refrained from establishing there as a result of it.” Id.
Although these findings were specific to public accommodations, they are applicable to commerce generally. Commercial goods and services pervade all economic channels, including all public accommodations, such as stores, restaurants, hotels, theaters, and the like. Discriminatory messages within such commercial channels threaten the same disruptive effects as the discrimination itself. Although the Majority distinguishes between conduct and speech, Maj. Op. at 1356-57, the distinction is without a difference in this context. Whether a restaurant named “SPICS NOT WELCOME” would actually serve a Hispanic patron is hardly the point. The mere use of the demeaning mark in commerce communicates a discriminatory intent as harmful as the fruit produced by the discriminatory conduct.
Because even speech without accompanying conduct can have a discriminatory impact, other parts of the Civil Rights Act expressly regulate pure speech in commerce. For instance, Title VIII specifically bans advertising that indicates a discriminatory preference, even where discriminatory conduct is legal. See 42 U.S.C. § 3604(c); see also § 3603(b) (listing exemptions). Title VII places similar restrictions on job advertisements. See 42 U.S.C. § 2000e-3(b). Title VII also bans pure speech in the workplace when the speech is harassing, even when unaccompanied by any adverse employment action, because such speech creates a discriminatory impact. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); see also Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).
Nearly every disparaging mark identified in the voluminous briefing and opinions in this case has involved disparagement of race, gender, ethnicity, national origin, religion, sexual orientation, and *1381 similar demographic classification. The impact of advancing these bigoted messages through the ubiquitous channels of commerce may be discriminatory, and even if not discriminatory, at least disruptive to commerce. The only question is whether the government’s interest in avoiding this commercial disruption outweighs the modest “burden” that its refusal to register the offending marks places on the freedom of speech. I believe it does.
D. Section 2(a) Survives Intermediate Scrutiny
To be clear, I do not believe that the government may ban any speech it finds commercially undesirable, but only that when we are presented with a regulation, we must engage meaningfully in “the task of assessing the First Amendment interest at stake and weighing it against the public interest allegedly served by the regulation.” Bigelow, 421 U.S. at 826, 95 S.Ct. 2222. Here, the government’s substantial interest in the orderly flow of commerce is counterbalanced only by a minimal “burden” on a small subset of low-value commercial speech. Section 2(a) should survive intermediate scrutiny because it is only an “incidental restriction on First Amendment freedom [that] is no greater than is essential to the furtherance of the governmental interest” in the orderly flow of commerce. See Barnes, 501 U.S. at 561, 111 S.Ct. 2456.
Section 2(a) imposes only a modest “burden” on speech. First, the statute applies only in the commercial context, meaning that it does nothing to impact private speech. Mr. Tam remains free to spread his chosen message to all who would listen without fear of government intervention or reprisal. Second, § 2(a) does not strictly “burden” Mr. Tam’s speech, but only denies him a government-created benefit— the exclusive right to use that speech in commerce in connection with the sale of particular goods or services. At bottom, the only burden the application of § 2(a) imposes in this case is that Mr. Tam is free to communicate his chosen message within or without commerce, so long as he is willing to permit others to do the same.
Section 2(a) also implicates only a modest sliver of particularly low-value speech. Speech that disparages is a narrow subset of speech that offends, and it is a particularly low-value subset at that. See Am. Freedom Def. Initiative v. Mass. Bay Transp. Auth., 989 F.Supp.2d 182, 192 (D.Mass.2013) aff'd, 781 F.3d 571 (1st Cir. 2015) (distinguishing speech that “crosses the line from being offensive or hurtful to being demeaning or disparaging”). To borrow a phrase from Justice Stevens, few of us would march our sons and daughters off to war to preserve the citizen’s right to be the exclusive purveyor of “OLD COON SMOKING TOBACCO.” See Young, 427 U.S. at 70, 96 S.Ct. 2440; McCann v. Anthony, 21 Mo.App. 83, 91-92 (1886).
The Supreme Court has routinely considered the relative value of burdened speech in its First Amendment analysis. See, e.g., Bethel Sch. Dist. No. 103 v. Fraser, 478 U.S. 675, 683, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986); Young, 427 U.S. at 70-71, 96 S.Ct. 2440; Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 510-11, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). For instance, the Court has held that a student’s interest in high-value political speech outweighed his school’s interest in avoiding a “substantial disruption,” Tinker, 393 U.S. at 510-11, 89 S.Ct. 733, but that a student’s interest in low-value “insulting” speech did not, Fraser, 478 U.S. at 683, 106 S.Ct. 3159. When low-value materials are concerned, “the State may legitimately use the content of these materials as the basis for placing them in a different classification” of First Amendment protection. Young, 427 U.S. at 71, 96 S.Ct. 2440.
*1382 At the extremes, disparaging speech enjoys no First Amendment protection. Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). “Insulting” words, which “by their very utterance inflict injury” are part of the “limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem.” Id. at 571-72, 62 S.Ct. 766. To whatever extent “disparaging” speech differs from “insulting” speech, its value is not much greater.
Additionally, any minimal value disparaging speech might offer in the marketplace of ideas is far diminished in the marketplace of goods and services, which is the only context at issue in this appeal. One can hardly imagine what legitimate interest a vendor of goods or services may have in insulting potential customers. Whatever value disparaging speech might possess when used in private life, it loses when used in commerce.
WTien we balance the government’s substantial interest in the orderly flow of commerce against the modest imposition of § 2(a) on a narrowly tailored portion of particularly low-value speech, the standards of intermediate scrutiny are satisfied. Whatever modest imposition the statute makes on the free flow of public discourse, it is nothing more than an “incidental restriction on First Amendment freedoni [that] is no greater than is essential to the furtherance of the governmental interest” in the orderly flow of commerce. See Barnes, 501 U.S. at 561, 111 S.Ct. 2456. For the foregoing reasons, I believe that § 2(a) is constitutional. I respectfully dissent.

. The registration of a trademark confers,a competitive advantage in the marketplace to the owner of the mark. Typically, in trademark disputes, opposition to the registration or use of a certain mark involves the commercial activities of a competitor. In such cases, the interests of both the owner and competitor are fundamentally commercial in nature.