DELIGHT, INC.

v.

BALTIMORE COUNTY, MARYLAND.

Civ. No. K–77–1082.

United States District Court,
D. Maryland.

June 27, 1979.

Nancy E. Paige, Lawrence S. Greenwald and Gordon, Feinblatt, Rothman, Hoffberger & Hollander, Baltimore, Md., for plaintiff.

J. Carroll Holzer, County Sol. and Raymond F. Altman, Asst. County Sol., Baltimore, Md., for defendant.

**FRANK A. KAUFMAN**, District Judge.

Plaintiff corporation, a land developer, challenges under the Equal Protection Clause of the Fourteenth Amendment of the federal constitution a provision of the Baltimore County, Maryland, Policy For Processing Proposed Land Developments (December 1973). Baltimore County, Maryland, is the named defendant.[1] The facts are complicated and require detailed recitation.

Section 22–34 of the Baltimore County Code ("Code") authorizes the County's Director of Public Works to require, as a precondition to subdivision plat approval, that the developer enter into a public works agreement ("PWA") for the construction of certain enumerated public improvements which the Director "may deem necessary or appropriate for the subdivision."[2] Section 22–120 provides that those improvements must be constructed either prior to approval of the subdivision plat for recording among the land records of the County, or, if those improvements are not constructed prior to that time, "arrangements must have been made with the Department of Public Works . . . to insure their subsequent proper completion by the developer."[3] Prior to December 10, 1973, the County, through its Department of Public Works and specifical-

[1] Jurisdiction exists pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3). The County is a person under 42 U.S.C. § 1983. *See Monell v. New York City Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Plaintiff originally claimed against a second defendant, but subsequently dismissed the suit against that defendant. *See* n. 4, *infra.*

[2] Section 22–34(c) provides in full:

(c) Before final approval of subdivisions the director of public works may require, in accordance with the subdivision regulations, the execution of a public works agreement for any or all of the following improvements it may deem necessary or appropriate: Street grading, pavement, gutters, curbs, sidewalks, street lighting, shade trees, surveyor's monuments, water mains, culverts, storm sewers, sanitary sewers or other means of sewage disposal, drainage structures, local open space tracts and such other subdivision improvements as the county may find necessary in the public interest. The public works agreement shall set forth the amount of the funds, if any, required to be paid by the developer or owner of the subdivision.

[3] Code § 22–120 provides:

The final plat of a subdivision shall consist of the official record plat and supporting detailed plans and data, as noted in this division. A final plat may include only a portion of the preliminary plan. No subdivision plat may be recorded and no lot therein may be sold legally until a final plat has been approved by the roads engineer and the planning board. Before a plat may be eligible for approval, the public improvements indicated in the preliminary plan, namely, any or all of the following that have been required by the roads engineer and the planning board: Street and alley pavements, sidewalks, water and sewer lines and storm drains, either must have been completed for that portion which is covered by the final plat, or arrangements must have been made with the department of public works, in accordance with its established procedure, to insure their subsequent proper completion by the developer.

ly through the Director of that Department, did not require the posting of security in any form by a developer seeking approval of a subdivision plat for recordation. A developer's contractual undertaking embodied in the PWA was all that was required insofar as Section 22–120 was concerned. On December 10, 1973 the County Administrative Officer approved the Baltimore County, Maryland, Policy For Processing Proposed Land Developments. At issue herein is § 4.3.2 of that Policy, which provides:

> The developer, prior to the signing of the PWA, shall present a certified check, letter of credit, or a bank book to cover his financial obligation specified in the PWA, when the development will have only roads and/or storm drains.

In enforcing the provisions of § 4.3.2, the County, through its Public Works Department draws distinctions among the following three categories of land. The first classification pertains to land which does not have public water or public sewers and which the developer desires to improve with wells and septic tanks as well as to be responsible for the financing of roads and storm drains. Classification 2 pertains to land in which public water and public sewerage are available at one or more of the borders of the land and in connection with which the developer desires to connect up to such public water and public sewerage and also to pay for the provision of roads and storm drains. Classification 3 pertains to land which is not provided with public water or public sewers and in connection with which the developer agrees to be responsible for the payment of its share of the costs of providing public water, public sewers, and to pay for roads and storm drains. Section 4.3.2 applies only to developers proposing developments of the type described in classification 1.

Prior to the adoption of that policy provision, the County experienced several instances in which developers in areas requiring only roads and/or storm drains as public improvements (wells and septic tanks not being included within Code § 22–34 as public improvements) failed or refused to honor the terms of their PWA's. In those instances, lot purchasers, who may or may not have purchased, or contracted for the construction of, a house contemporaneously with the purchase of that lot, found that though the homes they purchased or ultimately constructed were habitable, the roads and/or storm drains had not been completed. Section 4.3.2 was thought necessary to remedy that problem. In addition, the County sought, through § 4.3.2, to protect itself financially from defaulting developers, i. e., to protect itself from having to provide services the developer should have provided.

The requirements of § 4.3.2 were not extended to developers proposing, and executing PWA's as to, developments described in classifications 2 and 3 (i. e., those requiring the construction of or connection to public water and sewer lines in addition to construction of roads and/or storm drains). As to those classifications, the developer is required to post security for roads and storm drains as well as for water and sewers at a later stage in the overall subdivision-construction process, i. e., prior to the letting of bids for construction of public water and sewer lines in classification 3 and prior to "connecting up" in classification 2. Developers in classifications 2 and 3 are not issued plumbing permits and houses constructed on such lots are not permitted to be lived in until and unless the water lines and sewers are constructed and/or hooked up *and* the security for roads and/or storm drains is posted. The County has no record of ever having received complaints from homeowners in classification 2 and 3 subdivisions in respect to the completion in those developments of roads and/or storm drains.

Plaintiff Delight, Inc., is the owner of certain property known as Delight Meadows, Sections 2, 3 and 4. Prior to December 16, 1976, plaintiff's property was zoned "rural deferred development," a zoning classification permitting construction of single family residences on one acre lots. Plaintiff had secured approval of and had recorded subdivision plats for Delight Meadows, Section 2 prior to December 16, 1976 and in

so doing, because *all* of Delight Meadows (Sections 2, 3 and 4) is classification 1 property, complied with § 4.3.2 by posting the required security. On December 16, 1976, the Baltimore County Council adopted a new zoning map pursuant to which Delight Meadows as well as certain other parcels of land were zoned for "Resource Conservation (deferral of planning and development)." [4] Under that zoning classification, residences on one acre lots are permitted, but development is restricted to a maximum gross density of 0.3 dwellings per acre. The practical effect of that restriction is to (1) limit the construction of residences to three acre lots or (2) limit the construction of residences to cluster type dwellings leaving a substantial portion of the subdivision as open space.

In accordance with an express grandfather provision in the ordinance creating the new zoning classification, any existing lot or parcel of land with boundaries duly recorded among the land records of Baltimore County on or before December 16, 1976 is permitted to be developed in accordance with the standards in effect at the time of recordation. Pursuant thereto, plaintiff has proceeded with one-acre-lot development of Delight Meadows, Section 2 under the plat recorded prior to December 16, 1976. However, no plats for Delight Meadows, Sections 3 and 4 were recorded prior to December 16, 1976 because plaintiff did not tender the security as required by § 4.3.2 with regard to the PWA's covering Delight Meadows, Sections 3 and 4.[5]

In challenging § 4.3.2 under the Equal Protection Clause, plaintiff contends that § 4.3.2 discriminates on the basis of wealth and that "strict scrutiny" is the appropriate standard of review. Alternatively, plaintiff asserts that § 4.3.2 is totally lacking in rational basis and fails to achieve the purposes assigned to it by defendant, and is therefore unconstitutional. Plaintiff seeks a declaration by this Court that § 4.3.2 is unconstitutional and an order enjoining defendant from refusing to approve plaintiff's plats (covering Delight Meadows, Sections 3 and 4) for recordation solely because plaintiff has not complied with the requirements of § 4.3.2, such order to be issued *nunc pro tunc* as of December 15, 1976.[6] Defendant, responding, resists plaintiff's quest for all such relief, contending that § 4.3.2 is rationally related to legitimate County purposes.[7]

---

4. During a hearing in this case on March 2, 1979, plaintiff voluntarily dismissed count IV of her amended complaint in which the plaintiff claimed the "Resource Conservation (deferral of planning and development)" zoning classification was *per se* unconstitutional under the due process clause of the Fourteenth Amendment. This Court, with defendant's assent, permitted such dismissal without prejudice. Plaintiff had earlier dismissed damage claims asserted in its original complaint against the Director of Public Works of Baltimore County.

5. Those Sections 3 and 4 subdivision plans no longer, since December 16, 1976, comply with the zoning requirements which became effective on that date.

6. Defendant has suggested that if this Court were to invalidate Section 4.3.2, defendant might well choose alternatives other than those sought by plaintiff to iron out differences in the treatment of the three classifications and to cope with the December 16, 1976 zoning change. *Cf. Jablon v. Secretary of Health, Education & Welfare,* 399 F.Supp. 118, 131–33 (D.Md.1975) (three-judge court), *aff'd mem.* 430 U.S. 924, 97 S.Ct. 1539, 51 L.Ed.2d 768 (1977). In view of this Court's conclusion that

Section 4.3.2 is not invalid, that issue is not reached herein.

7. Prior to plaintiff's voluntary dismissal of count IV in this case, see n. 4, *supra,* in which plaintiff attacked as *per se* unconstitutional the "Resource Conservation (deferral of planning and development)" zoning classification, defendant argued that this Court should abstain in this case and require plaintiff first to test its claims in state court and/or state administrative bodies. *See Colorado River Water Cons. Dist. v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976); *Wincamp Partnership v. Anne Arundel County, Maryland,* 458 F.Supp. 1009, 1016–20 (D.Md.1978); *Kent Island Joint Venture v. Smith et al.,* 452 F.Supp. 455 (D.Md.1978). For reasons set forth in *Wincamp,* the soundness of defendant's abstention position would appear doubtful. But that issue need not be resolved herein.

Defendant also contends that plaintiff has waived its rights and lacks standing to challenge the validity of the § 4.3.2 because plaintiff allegedly received the "benefits" of § 4.3.2 when plaintiff recorded its plat covering Delight Meadows, Section 2; and failed to execute the PWA's covering Delight Meadows, Sections

■ In essence plaintiff's challenge to § 4.3.2 is bottomed on plaintiff's contention that the County may not with regard to PWA approval treat the subdivision process and the building permit/construction process as a single transaction in respect to code provision 22–120. According to plaintiff, the County's view of what is likely to take place with regard to lots in a subdivision subsequent to the recordation of the subdivision plat is not a relevant consideration for defendant in respect to the need to make "arrangements . . . to insure [the] subsequent proper completion by the developer" of the undertakings contained in the PWA. The record does disclose that the subdivision phase is legally and administratively separate, in some ways, from the building permit/construction phase. The former process is generally controlled by and under the direction of the Department of Public Works; the latter process is under the control of the Department of Permits and Licenses. Further, once *any* subdivision plat is recorded, there is nothing to prevent the sale of individual lots to individuals desiring to build a home on that lot. Defendant concedes that it is possible for a developer in a classification 2 or 3 subdivision to sell such individual lots after recording the subdivision plat, but before the time for posting security then to default upon its [the developer's] obligations covering one or more services, leaving the prospective home owner (and the County) without roads or storm drains. However, defendant Baltimore County urges that it is entitled to presume that the recording of a subdivision plat is in most instances a practical as well as a legal predicate for actual home construction and that it may treat those two somewhat separate phases as a whole insofar as assuring compliance with rules and regulations relating to each. It would appear to be beyond cavil that it makes common sense for the County, even though it has administratively separated the various

functions, not to close its regulatory eyes during the first, subdivision stage, to whatever potential difficulties may arise at the later, construction stage. Moreover, as to the County's different treatment of the three classifications, the County's own past actual experience, does provide some (though perhaps minimal) basis for the County's conclusion, that despite the *possibility* of defaults by developers in all three categories, there are sufficient dissimilarities among and between developers and subdivision proposals to warrant a difference in treatment. Section 4.3.2 is a reasonable response to those perceived differences. The fact that the distinctions drawn by § 4.3.2 are not *expressly* authorized by the County Code is not relevant or material to plaintiff's within constitutional attack, in the absence of any indication that the County has not acted in good faith and with no suggestion of intent to discriminate on any basis other than in connection with such discrimination as results from the different treatments among the three classifications.

Section 4.3.2 of the County's subdivision policy is a "local economic regulation." Very recently, in *Friedman v. Rogers,* 440 U.S. 1, 17, 99 S.Ct. 887, 898, 59 L. Ed.2d 100 (1979), Mr. Justice Powell writing for a unanimous court reiterated the standard of review applicable to that type of regulation:

> We stated the applicable constitutional rule for reviewing equal protection challenges to local economic regulations such as § 2.02 in *New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976).
>
> "When local economic regulation is challenged solely as violating the Equal Protection Clause, this Court consistently defers to legislative determinations as to the desirability of particular

---

3 and 4 and present same for approval to the "proper officials." These contentions lack merit. As to Section 2, plaintiff as was its right *under the grandfather clause avoided the bur-*den of noncompliance. As to Sections 3 and 4, whether or not plaintiff actually presented the

unsecured PWA's to the Public Works Department or the latter's Director, plaintiff, if it had done so, would have acted with total futility. The County itself has stated in this case that it has never granted any exception to the requirements of § 4.3.2.

statutory discriminations. See, e. g., *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973). Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest." [8]

Nor is the County's policy expressed in § 4.3.2 subject to attack in its application to plaintiff. That policy has been consistently applied.[9] Nor does the possibility that the County could have chosen some other alternative to accomplish its purposes present any basis for the relief plaintiff seeks. Thus, in *Hughes v. Alexandria Scrap Corporation*, 426 U.S. 794, 810–14, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976) Mr. Justice Powell wrote (at 813, 96 S.Ct. at 2499):

> It is well established, however, that a statutory classification impinging upon no fundamental interest, and especially one dealing only with economic matters, need not be drawn so as to fit with precision the legitimate purposes animating it.

*Williamson v. Lee Optical Co.*, 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1955). That Maryland might have furthered its underlying purpose more artfully, more directly, or more completely, does not warrant a conclusion that the method it chose is unconstitutional. See *Katzenbach v. Morgan*, 384 U.S. 641, 657, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966).[10]

In order to prevail, plaintiff has the burden of establishing a lack of rational connection between the County's security posting requirement and the County's interest in assuring compliance with the PWA's in classification 1 developments. That is a burden plaintiff has not borne. Pursuant to Art. XI–A § 2 of the Maryland Constitution, the General Assembly of the state is authorized to and has enacted pursuant thereto the Express Powers Act, Md.Code Ann. Art. 25A which in turn provides a grant of express powers for charter counties. Under § 5(X) of that Act, Baltimore County is authorized to "enact local laws, for the protection and promotion of public safety, health, morals and welfare, relating to zoning and planning." The County Code authorizes the adoption of "provisions as to the extent to which streets and other ways,

---

8. *Friedman* involved, inter alia, equal protection and due process challenges to a provision of the Texas Optometry Act requiring that a majority of the state's Optometry Board be members of a certain professional association of optometrists to which plaintiff in *Friedman* did not belong.

9. *See* n. 7, *supra.*

10. In *Parham v. Hughes*, —— U.S. ——, 99 S.Ct. 1742, 60 L.Ed.2d 269 (1979) (plurality opinion), the father of an illegitimate child challenged on equal protection grounds a Georgia statute that permitted the mother but not the father of such child to sue for wrongful death of the child where the father had not, pursuant to statute, legitimated the child. Mr. Justice Stewart, writing for a plurality of the Court consisting of himself and Mr. Chief Justice and Justices Rehnquist and Stevens, held that the statutory requirement was rationally related to the state's interest in "dealing with the problem of proving paternity." In so holding, Mr. Justice Stewart wrote:

> The appellant argues, however, that whatever may be the problem with establishing paternity generally, there is no question in this case that he is the father. This argu-

ment misconceives the basic principle of the Equal Protection Clause. The function of that provision of the Constitution is to measure the validity of classifications created by state laws. *Since we have concluded that the classification created by the Georgia statute is a rational means for dealing with the problem of proving paternity, it is constitutionally irrelevant that the appellant may be able to prove paternity in another manner.* [Emphasis added.]

Mr. Justice Powell, concurring in the judgment, applied the more searching standard of review: whether "gender-based distinctions must 'serve important governmental objectives and must be substantially related to achievement of those objectives.' *Craig v. Boren*, 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1977). . . ." *See also, Trafelet v. Thompson*, 594 F.2d 623 (7th Cir. 1979). Therein, in a suit involving a challenge to an Illinois statute requiring mandatory retirement of judges at age 70, the Court noted that (at 627) it was "irrelevant that evidence was adduced to rebut this data" i. e., the data supporting the enactment by the Illinois legislature.

water, sewer and drain pipes, local open space tracts and other public facilities shall be provided for, as a condition precedent to approval of the subdivision plat." [11] The adoption of § 4.3.2 is a reasonable exercise of that authority.

If a developer should sell homes in a subdivision or lots upon which the purchasers plan to build and occupy homes, and then fail to perform his PWA obligations to build the roads and/or storm drains, the potential harm to the public is clear. Both the purchasers and the County taxpayers could suffer since roads and storm drains must be built and financed in any event. Once a PWA is executed and a plat with regard to a classification 1 subdivision is recorded, the risks of harm from the developer's default may well become greater, since houses without roads and storm drains are legally habitable and thus more marketable if those houses have plumbing (i. e., septic tanks and wells) than if they do not have plumbing. Thus, in the case of classification 1 developments the last point of workable control may be prior to execution of the PWA and final subdivision plat approval, whereas a later control point may be feasible as to subdivisions requiring new water and sewer utilities or a plumbing "hook-up" since in those cases no plumbing permits can be issued before the utilities are available. Thus, the posting of the security can perhaps be safely delayed until the time for "hook-up" or awarding the utility contracts (a point never occurring in classification 1 subdivisions since the utilities are either already in or are not going in at all, i. e., wells and septic systems). Purchasers may well buy homes without paved streets but they may be much more skeptical about accepting a promise for running water "soon".

The record in this case discloses a sufficient basis for the County to conclude that the nature and location of the developments proposed and built by each class of developers are different, that subdivisions in classification 1 are constructed primarily in rural areas beyond the limits where public water and sewer facilities will be provided within the County's ten-year water and sewer plan; and that, on the other hand, subdivisions requiring new water and sewer facilities are generally located in more urban areas. It is also relevant to note that the County pays a portion of the costs for new water and sewer facilities but makes no payments for roads and/or storm drains. Once the developer in classification 1 has made his deposit and secured his plat approval, his development can be under way. Because he is dependent neither on the allocation of *County* funds nor on County installation (or County supervision thereof) of public water and sewer line, the developer in classification 1 retains substantial control over the timing of his construction and the use of his deposited security. The timing of the developer's project in classifica-

---

11. Code § 22–32 provides:

The planning board from time to time shall prepare and submit to the county council for its approval or disapproval recommendations for the amendment or supplement to regulations governing the subdivision of land throughout the county (codified in article V of this title), including but not limited to standards for approving the design of subdivisions, requirements for the submission of subdivision plats and the procedure to be followed by subdividers. Such regulations may provide for the proper arrangement of streets, in relation to other existing planned streets and to the master plan, and local open space tracts, for adequate and convenient open spaces for traffic, recreation, utilities, access of firefighting apparatus, light and air, and for the avoidance of congestion of population, including minimum widths and areas of lots. Such minimums shall coincide with such provisions in the Zoning Regulations for the county.

These subdivision regulations may include provisions as to the extent to which streets and other ways, water, sewer and drain pipes, local open space tracts and other public facilities shall be provided for, as a condition precedent to approval of the plat. Such regulations may provide for tentative approval of the plat, but any such tentative approval shall be revocable. The subdivision regulations shall be adopted, with amendments of any, and may from time to time thereafter be amended by the county council by ordinance after public hearing. Copies of the subdivision regulations shall be made available to the public, and a reasonable charge therefor may be made.

tion 3, on the other hand, is dependent on the allotment of *County* funds for its share of the sewer and water costs, an event not within the developer's control and one which conceivably could tie up the developer's security deposit for a much longer time if he were required to post it as early as the execution of the PWA. Considerations of those types provide bases for differences which are not irrational.

 Nor does § 4.3.2 involve such a distinction based upon wealth so as to require that that provision pass muster under the "strict scrutiny" standard of review. Supreme Court cases so testing classifications based upon wealth have involved burdens placed on the exercise of fundamental important personal rights of individuals, as Mr. Justice Powell has pointed out in *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 20–29, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Nothing approaching a fundamental personal right is in any way implicated in this case. It is true that plaintiff conclusorily alleges lack of sufficient wealth to post security as presently required by § 4.3.2. But plaintiff has proffered no specifics in that regard. Even if plaintiff had so done, plaintiff would seemingly be in the same or worse position as plaintiffs in *Rodriguez*. Therein, Mr. Justice Powell wrote (at 28, 93 S.Ct. at 1294):

> However described, it is clear that appellees' suit asks this Court to extend its most exacting scrutiny to review a system that allegedly discriminates against a large, diverse, and amorphous class, unified only by the common factor of residence in districts that happen to have less taxable wealth than other districts. The system of alleged discrimination and the class it defines have none of the traditional indicia of suspectness: the class is not saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from

the majoritarian political process. [Footnote omitted.]

The differences in wealth between residents of the Texas school districts involved in *Rodriguez* would appear to be greater than the differences among developers such as plaintiff. But, in any event, they are hardly such differences as create a suspect class.

In summary, on all points, plaintiff's within challenge fails to pass muster.[12] Accordingly, judgment will be entered for defendant.

---

**12.** In the light of that conclusion, it is unnecessary in this opinion to determine whether a § 1983 claim involving an alleged discrimination on the basis of wealth is maintainable by a *corporate* plaintiff.